COMMONWEALTH vs. PAUL J. SHEEHAN.

Plymouth. January 11, 2001. - October 2, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Rape. Evidence,* Medical record, Impeachment of credibility, Relevancy and materiality. *Witness,* Credibility.

Discussion of the procedure set forth in *Commonwealth* v. *Bishop,* 416 Mass. 169, 179-183 (1993), mandating a five-stage procedure for defendants seeking access to treatment records of complainants in sexual assault cases, and the applicability of the procedure to the facts of this case. [185-188]

At the trial of an indictment for rape of a ten year old child, in which the defendant moved to be provided with certain of the complainant's mental health records to support the theory of defense that the complainant fantasized the event in question, the motion judge should have conducted a so-called Stage Four proceeding pursuant to *Commonwealth* v. *Bishop,* 416 Mass. 169, 179-183 (1993), to determine whether the defendant could demonstrate that disclosure of the relevant portions of the records was necessary for the purpose of preparing the defense, and the error in the ruling on the records created a substantial risk of a miscarriage of justice that required a new trial. [188-190] GREANEY, J., concurring; SPINA, J., concurring, with whom MARSHALL, C.J., joined; SOSMAN, J., concurring, with whom IRELAND and COWIN, JJ., joined.

At the trial of an indictment for rape of a ten year old child, there was no support in the evidence for the prosecutor's labelling the defendant a "predator," and the remark was unwarranted. [190-191]

INDICTMENT found and returned in the Superior Court Department on January 18, 1994.

A motion for access to psychiatric records was considered by *Suzanne V. DelVecchio,* J., and the case was tried before *John A. Tierney,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Colleen A. Tynan,* Committee for Public Counsel Services, for the defendant.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

CORDY, J. The defendant was convicted by a jury of rape of a child, his ten year old nephew, whom we shall call Steven. The Appeals Court reversed the defendant's conviction, set aside the verdict, and remanded the case for a new trial because in a pretrial order a motion judge had improperly ruled Steven's mental health records inadmissible at trial. In reaching its conclusion, the Appeals Court reviewed the records in question and concluded that the records contained information that could have supported the defendant's contention that his nephew had imagined the incident. Thus, that court concluded that the records were sufficiently probative that their exclusion deprived the defendant of a fair trial. *Commonwealth* v. *Sheehan*, 48 Mass. App. Ct. 916 (2000). We granted the Commonwealth's application for further appellate review. We have also examined the records in question. We agree with the result of the Appeals Court and for substantially the reasons set forth in its opinion.

The relevant facts may be summarized as follows. On August 17, 1993, the defendant invited Steven to spend the night at his house and Steven's mother agreed. Steven seemed immature for his age and was known to have a slight learning disability. He and his mother had previously lived with the defendant, and Steven had a good relationship with the defendant.

The defendant and Steven arrived at the defendant's house at approximately 12:30 A.M. The defendant fixed Steven a snack, and Steven prepared for bed. Steven claims that the defendant came into the bedroom with butter. Steven was lying on his stomach and remembers that his clothes "got off" but did not know how or when they were removed. According to Steven, the defendant put butter on Steven's "butt" and inserted his penis in Steven's rectum for "a couple of seconds." Steven asserts that the defendant then put his penis in Steven's mouth and told Steven that he would "give [him] a dollar" if he let the defendant keep his penis in Steven's mouth for the rest of the night. Steven claimed that he does not remember how long the defendant's penis was in his mouth but that he slept in the defendant's bed with the defendant. The defendant asserts that after he fixed Steven a snack, Steven fell asleep on his bed, and that he spent the night sleeping on the living room sofa.

The next morning the defendant returned Steven to his home.

Steven told his mother that the defendant had "put his pee-pee in my bum-bum." His mother claims that she asked the defendant what happened and that the defendant responded that nothing had happened and left.

Steven's mother then took him to a hospital. Dr. Deborah Hartley visually examined Steven's rectum and found no bleeding or tearing of the rectal tissue. The doctor did not perform a digital examination or administer a rape kit.

The next day, Steven and his mother spoke with Detective Ralph N. Forni of the Wareham police department. Steven told the detective that the defendant had "put butter on my bum and licked my pee-pee." Detective Forni informed the defendant of Steven's allegations the following day. The defendant stated that he believed he should contact an attorney, and Detective Forni allowed the defendant to return home.

Prior to trial, in accordance with the procedure set forth in *Commonwealth* v. *Bishop*, 416 Mass. 169, 179-183 (1993) (*Bishop* procedure),[1] the defendant filed a motion seeking access to Steven's mental health records.[2] On November 21, 1995, a judge in the Superior Court (motion judge) ruled that the

---

[1]At the time of the filing of the motion in this case, the *Bishop* procedure, *Commonwealth* v. *Bishop*, 416 Mass. 169 (1993), mandated a five-stage procedure for defendants seeking access to treatment records of complainants in sexual assault cases. Stage One was a determination whether the records were privileged. If they were, Stage Two required that the defense submit to the judge in writing "the theory or theories under which the particular records sought [were] likely to be relevant to an issue in the case." *Id.* at 181-182. If the judge decided that the defendant's proffer established that the records were likely to be relevant, the judge reviewed the records in camera to determine whether any of the materials were relevant. These portions were then made available to the defense attorney and the prosecutor subject to a protective order (Stage Three). *Id.* at 182. The Stage Two procedure established in *Commonwealth* v. *Bishop*, *supra*, was later modified in *Commonwealth* v. *Fuller*, 423 Mass. 216, 226 (1996), to provide that the judge is to consider whether the defendant by motion "has demonstrated a good faith, specific, and reasonable basis for believing that the records will contain exculpatory evidence which is relevant and material to the issue of the defendant's guilt," and whether the material is available elsewhere. The appropriate standard for the Stage Two determination is not at issue.

[2]The records originally sought were those of counsellors from South Bay Mental Health Center, the Department of Social Services, and a Dr. Triberg of Pembroke Hospital. The record does not reveal any further proceedings regarding the records of Dr. Triberg and the parties have not raised any issue concerning those records.

defendant had demonstrated a theory on which the records were likely to be relevant and ordered that all records of South Bay Mental Health Center and the Department of Social Services (DSS)[3] be made available to both counsel subject to a protective order.[4] After this point, the course of the proceedings becomes less clear. On November 6, 1996, the same motion judge caused a handwritten notation to be made on the face of the November 21, 1995, order: "[a]fter [r]eview of [i]mpounded [r]ecords, the [c]ourt finds no exculpatory [e]vidence for [u]se at [t]rial."[5] It is this 1996 order that forms the subject of this appeal. The defendant argues that the records of South Bay Mental Health Center and DSS revealed that Steven had difficulty distinguishing fantasy from reality and that he fantasized to escape anxiety-provoking situations; because the defense was that Steven fantasized the event in question, the records were relevant to that defense, and the judge's nondisclosure order deprived the defendant of the use of the records to assist his defense.

The first problem presented by this case is procedural. By her order of November 21, 1995, the motion judge indicated that she had determined the records to be relevant pursuant to a *Bishop* Stage Two determination.[6] Her protective order of the same date was in compliance with Stage Three of the *Bishop* procedure.[7] Thus, at this point any further proceedings regarding the records presumably would be governed by Stage Four

---

[3]The order referred to records of South Bay Mental Health Center, the Department of Social Services, and Dr. Deborah Hartley. Dr. Hartley examined Steven the morning after the alleged incident. Her records are not relevant to the issues herein.

[4]In compliance with Stage Three of *Commonwealth* v. *Bishop, supra* at 182, 189, the order provided that counsel for both parties were to have access to the subject records (and could make notes therefrom), but that the contents thereof were not to be photocopied or reproduced in any way or disclosed to anyone, including the defendant, without prior "application to and an order of the court." The order also provided that counsel could not offer any portion of the records at trial except on order of the court.

[5]Apparently the judge reviewed the records sometime after she issued the Stage Three order. According to the *Bishop* procedure, the records are to be reviewed by the judge as part of Stage Two, prior to their being made available to counsel. See note 1, *supra*.

[6]See note 1, *supra*.

[7]Stage Three provides as follows: "The judge shall allow defense counsel and the prosecutor access to the relevant portions of the privileged records for

of the *Bishop* procedure. Stage Four requires that the defendant demonstrate that disclosure of the relevant portions of the records to the trier of fact is required to provide the defendant a fair trial. If so, the judge is to permit disclosure of those portions of the records shown to be needed to prepare and mount a defense.

In arriving at this determination, the judge is to base his or her decision on written motions by the parties and an in camera hearing as the judge deems necessary. "In any case, the judge shall set forth in writing the reasons for the decision in a memorandum of decision." *Commonwealth* v. *Bishop, supra* at 183.[8] But the parties were not required to provide the Stage Four written motions; the judge did not set forth in writing the reasons for her decision; and, as far as the record reveals, no hearing (in court or in camera) was held. All that is before us is the judge's notation that the records are not exculpatory for use at trial. We take this to be a determination by the judge that the defendant had not met his Stage Four burden of demonstrating that disclosure of the records to the trier of fact was necessary to provide the defendant a fair trial. We do so because of the

---

the sole purpose of determining whether disclosure of the relevant communications to the trier of fact is required to provide the defendant a fair trial.

"The judge shall ensure that breaches of confidentiality attending access to the relevant portions of the privileged records are limited only to those absolutely and unavoidably necessary. Any records so examined shall be subject to a protective order of the type presented in the Appendix to this opinion to ensure that the information will not be divulged beyond the extent required for the purpose stated above. The judge shall allow counsel access to the privileged records only in their capacity as officers of the court." *Commonwealth* v. *Bishop*, 416 Mass. 169, 182 (1993).

[8]Stage Four provides as follows: "The burden is on the defendant to demonstrate that disclosure of the relevant portions of the records to the trier of fact is required to provide the defendant a fair trial. If the defendant meets this burden, the judge shall permit the disclosure of those portions of the records which are shown to be needed for the purpose of preparing and mounting a defense. The judge may condition disclosure on appropriate terms and conditions. In arriving at this determination the judge shall resolve any doubt he or she may have in the defendant's favor. The judge shall base his or her decision on written motions by the parties and an in camera hearing as the judge deems necessary. In any case, the judge shall set forth in writing the reasons for the decision in a memorandum of decision. The judge should identify any undisclosed materials so that in the case of conviction and appeal they may be sealed and transmitted to the reviewing court." *Commonwealth* v. *Bishop, supra* at 182-183.

prior rulings on the issue by the motion judge (apparently made pursuant to Stages Two and Three of the *Bishop* procedure) and because the parties have not indicated that any other stage applies.[9]

Regardless of the posture in which this issue was presented, the motion judge should have conducted a Stage Four proceeding to determine whether the defendant could demonstrate that disclosure of the relevant portions of the records was necessary for the purpose of preparing and mounting a defense. We keep in mind that in making the Stage Four decision, the judge is to "resolve any doubt . . . in the defendant's favor."[10] *Commonwealth* v. *Bishop, supra* at 183. As in many cases of this nature, the trial was a credibility contest between the complainant and the defendant. There was no corroboration from physical evidence or eyewitness testimony. The defense was that the ten year old complainant, who had a learning disability, was immature for his age, had difficulty distinguishing fantasy from reality and had imagined the incident.[11]

An examination of the records that the defendant was prohibited from disclosing to the trier of fact reveals that they contain statements that the complainant did have some tendency to fantasize inappropriately and to converse in his mind with his deceased grandmother. The records also state: "His cognitive processing of information presented to him seems somewhat unsophisticated and immature, which may predispose him to less effective interpretations of events in his environment." This information provides abundant fodder for cross-examination of Steven and his mother as to the reality of the child's perceptions.

We recognize that the defendant was not deprived completely

---

[9]Defense counsel suggested at oral argument that the judge's handwritten 1996 order may have been prompted by a motion in limine filed by the Commonwealth to exclude the records from trial. The record does not reflect such a motion, although the transcript indicates that the assistant district attorney stated at a bench conference that the Commonwealth filed the motion that prompted the order.

[10]We are aware that the judge in this case did not have the benefit of written motions by the parties. See *Commonwealth* v. *Bishop, supra* at 182-183, regarding Stage Four.

[11]This had consistently been the theme of the defense, as indicated by an affidavit of relevancy filed by the defendant approximately one year prior to trial in connection with another *Bishop* motion.

of his defense. He was able to cross-examine Steven at trial regarding the fact that, when he was ten years old (his age at the time of the alleged incident) he still believed in Santa Claus and the Tooth Fairy and that he would pretend he was a "Power Ranger." Steven said that he thought he believed at age ten that the "Power Rangers" were real. This evidence, however, is not nearly as compelling as evidence of mental health professionals regarding the boy's perception difficulties. The records provided evidence that "went directly to the issue of [the complainant's] credibility, the core issue to be resolved by the jury." *Commonwealth* v. *Pare*, 427 Mass. 427, 431 (1998). The evidence "could have made it more likely, in the jury's view, that the complainant did not perceive the event accurately . . . [and] could have been helpful for the jury to determine whether the complainant was telling the truth or whether [he] imagined the entire incident." *Commonwealth* v. *Fayerweather*, 406 Mass. 78, 83 (1989).[12]

The Commonwealth argues that the admission of the complainant's mental health records would not have benefited the defendant because the complainant had no psychiatric history prior to the alleged rape and the therapists all describe Steven's fantasizing as a coping mechanism. It is true that the treatment did not begin until after the alleged rape and that it was precipitated by marked changes in the child's behavior (sleep disturbances, more anger and aggressiveness, fear, and bed-wetting). Although the reports do indicate that these problems were due to the alleged rape and did not occur before it, the records at least provide a basis for the premise that the child's fantasies predate the alleged rape and were the result of his grandmother's death and the absence of a father in his life. The records provide a basis for cross-examination about the possibility that these earlier events in Steven's life caused him to fantasize and have problems separating reality from fiction. The records also state that the boy's mother believed that his

---

[12]The harm to the defendant from the absence of the material in the records was accentuated by the difficulties of preparing a defense on the facts in this case: Steven had previously been on very good terms with his uncle (and thus had no apparent motive to fabricate); and there was a four-year delay between the alleged rape and the date of trial, during which time Steven had become more mature.

immaturity was the result of a serious illness (mononucleosis) when he was seven years old. They further state that Steven has a hearing problem that interferes with his understanding in class and that the hearing problem needed follow-up examination. All these issues could have been examined at trial in an effort to impair Steven's credibility. See *Commonwealth* v. *Fayerweather, supra.*

To the extent that the records were damaging to the defense (by suggesting that the alleged rape did in fact occur), it was for defense counsel to decide whether their value outweighed their harm. Counsel was deprived of the ability to make that choice by the judge's ruling. *Commonwealth* v. *Bishop, supra* at 182-183.

The Commonwealth argues that the defendant was obliged to raise the issue of the admissibility of the records at trial and that the defendant made a reasonable tactical choice not to seek to introduce the records because of their tendency to suggest that Steven's mental health problems were due to the rape. We agree with the Appeals Court, however, that it appears from the transcript that the parties considered themselves bound by the motion judge's order of exclusion.

Even if an objection at trial were required, the error in the ruling on the records created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Comtois,* 399 Mass. 668, 674 (1987), citing *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967). The records were needed to support the defense; without them, it was simply the defendant's word against Steven's. The Commonwealth's case rested almost entirely on the testimony of the complainant. "[T]he . . . evidence, if believed, might have had a significant impact . . . on the outcome of the trial." *Commonwealth* v. *Bohannon,* 376 Mass. 90, 95 (1978), *S.C.,* 385 Mass. 733 (1982). "When evidence concerning a critical issue is excluded and when that evidence might have had a significant impact on the result of the trial, the right to present a full defense has been denied." *Id.* at 94, and cases cited.

Although our ruling on the *Bishop* issue requires reversal, we comment on the defendant's claim that the prosecutor, in his closing argument, improperly attacked the defendant by labeling him a "predator" who "picked the weak chick to prey upon."

The defendant made timely objection to this remark at the close of the Commonwealth's argument. See *Commonwealth* v. *Person*, 400 Mass. 136, 139 (1987). "Predator" is defined as "one that preys, destroys, or devours." Webster's Third New Int'l Dictionary at 1785 (1993). Although "[h]yperbole in closing arguments is hardly rare, and juries should be given credit for the ability to filter out oratorical flourishes," *Commonwealth* v. *Griffith*, 45 Mass. App. Ct. 784, 787 (1998), there is no support in the evidence for labelling the defendant a "predator," and the remark was unwarranted.

The judgment of conviction is reversed, the verdict is set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*

GREANEY, J. (concurring). I agree with the result in this procedurally unique case. I write separately to express my concern about the tone of the concurring opinion of Justice Sosman, with whom Justices Ireland and Cowin join, and also to state reservations about its substance. While the opinion stops short of stating definitively that the three Justices will vote to overrule the protocol established in *Commonwealth* v. *Bishop*, 416 Mass. 169 (1993), and *Commonwealth* v. *Fuller*, 423 Mass. 216 (1996), it comes close to saying so. A Justice certainly may express an interest in receiving further comments and recommendations about the protocol, even a recommendation that the protocol be discontinued. It is quite another matter to condemn the protocol by adjectival attack in a way that is disconcerting for two reasons. First, the protocol is of recent adoption, having been formulated after considerable deliberation by unanimous courts (assisted in the *Fuller* case by extensive briefing from many interested parties) in order to balance two strongly competing interests, those embodied in statutory privileges which, among other considerations, protect the rights of those claiming to be victims of degrading crimes and the interests of defendants in obtaining a fair trial. Second, the condemnation of the protocol occurs without any suggestion in Justice Sos-

man's concurring opinion of an alternate procedure that would reach a fair accommodation between the interests, when a record and data exist that at least one prior effort at accommodation has proved to be, in the words of that concurring opinion, a "failed experiment." *Post* at 199 (Sosman, J., concurring). See *Commonwealth* v. *Stockhammer*, 409 Mass. 867 (1991). In my view, it is not an answer to say that the protocol is onerous to administer. There are many onerous procedures that judges must administer. Examples include mandatory (and often lengthy) evidentiary proceedings on motions to suppress and time-consuming voir dire hearings to determine the admissibility of evidence. The *Bishop-Fuller* protocol falls in the latter category. The protocol deals with established foundational requirements intended to determine whether evidence may be discovered and admitted at trial. The procedure seeks to reject attempts to gather evidence that may be irrelevant or only marginally relevant by rummaging through privileged records in an attempt to show that the complainant is mentally unstable, deranged, or not worthy of belief. We are open to improving judicially created tests and would give consideration to reasonable suggestions for change. We must do so by giving due regard to the privileges. We must also maintain stability in the law by confirming that the court is a continuing body that will not overthrow existing precedent simply because its membership changes.

SPINA, J. (concurring, with whom Marshall, C.J., joins). I concur. I share the view of Justice Greaney, who states in his concurrence that the *Bishop-Fuller* protocol "seeks to reject attempts to gather evidence that may be irrelevant or only marginally relevant by rummaging through privileged records in an attempt to show that the complainant is mentally unstable, deranged, or not worthy of belief." *Ante* at 192 (Greaney, J., concurring). The *Bishop-Fuller* protocol was developed in the context of sexual abuse cases, but it has broader implications.

Efforts to discover and adduce evidence of privileged material is particularly problematic, and judges are often challenged to make close analyses and give painstaking care to the issue

because of the importance to those directly affected by disclosure and nondisclosure, and because of the significant social consequences of disclosure and nondisclosure of privileged material. We need only look to the complex litigation that has developed around efforts to penetrate the attorney-client privilege. See, e.g., *Matter of a John Doe Grand Jury Investigation*, 408 Mass. 480, 485 (1990); *Commonwealth* v. *Goldman*, 395 Mass. 495, 502 n.8, cert. denied, 474 U.S. 906 (1985). The privileges that most frequently arise in the context of sexual assault cases are no less deserving of judicial time and attention.

In my view the protocol strikes an appropriate balance between the competing interests of a defendant's right to a fair trial and a witness's expectation that his or her privacy will be protected by the privileges created by the Legislature. It may well be that over time the protocol may undergo more changes, perhaps many more changes, to satisfy developments in constitutional law. I do not believe, however, that it would be wise to abandon the protocol and to open for inspection the privileged records of *all* witnesses (*Bishop-Fuller* is not limited to sexual assault cases, and it is not limited to discovery of evidence of a witness's competence to testify) to search for potentially exculpatory evidence. It is both appropriate and constitutionally defensible to require a criminal defendant to make a showing of "a good faith, specific, and reasonable basis for believing that the records will contain exculpatory evidence which is relevant and material to the issue of the defendant's guilt," and whether the material can be obtained through other means. *Commonwealth* v. *Fuller*, 423 Mass. 216, 226 (1996). Cf. *Commonwealth* v. *Bianco*, 388 Mass. 358, 368-369, *S.C.*, 390 Mass. 254 (1983) (substantial basis required before impeaching witness's ability to perceive and recall events due to claimed use of marijuana). It is not too much to ask trial judges to spend some of their very valuable time on these important questions.


Sosman, J. (concurring, with whom Ireland and Cowin, JJ., join). I concur with the result reached by the court, as I agree that this defendant should have been allowed to put before the

jury the treatment records pertaining to the complaining witness's tendency to fantasize. I write separately, however, to point out the ways in which this case illustrates the shortcomings of the procedures announced in *Commonwealth* v. *Bishop*, 416 Mass. 169 (1993), shortcomings that were exacerbated to the point of questionable constitutionality by this court's modification of those procedures three years later in *Commonwealth* v. *Fuller*, 423 Mass. 216 (1996). In my view, this system governing access to records is both unduly cumbersome and constitutionally flawed.

The promulgation of the detailed protocol in *Bishop* amounted to rule making, undertaken without input from any segment of the criminal justice system or the public that would be affected by those new rules.[1] Not surprisingly, those rules, while well intentioned in theory, have proved burdensome and unworkable in practice. To prosecutors, defense counsel, defendants, complaining witnesses, health care providers, and trial judges, the *Bishop* procedures have engendered untold amounts of

---

[1]Neither the Commonwealth nor the defendant in *Commonwealth* v. *Bishop*, 416 Mass. 169 (1993), requested the court to overrule or revisit the very different protocol that had been adopted just two years earlier in *Commonwealth* v. *Stockhammer*, 409 Mass. 867 (1991), and made retroactive to all cases then pending on direct appeal by *Commonwealth* v. *Figueroa*, 413 Mass. 193 (1992), *S.C.*, 422 Mass. 72 (1996). Indeed, based on *Commonwealth* v. *Figueroa*, *supra*, the Commonwealth acknowledged that the defendant was entitled to a remand for purposes of conducting the inspection of records to which he was entitled under *Commonwealth* v. *Stockhammer*, *supra*. There were no amicus briefs filed in *Commonwealth* v. *Bishop*, *supra*, and the court did not ask for amicus briefs in the case or otherwise announce that it was considering any substantive revision of its recent decisions in *Commonwealth* v. *Stockhammer*, *supra*, and *Commonwealth* v. *Figueroa*, *supra*. Thus, the procedural rules adopted in *Commonwealth* v. *Bishop*, *supra*, were crafted not only without input from the sources that normally assist this court with the promulgation of rules, but without any input from either of the parties or from any amici curiae.

Due to victims' concerns about the divulging of sensitive and confidential information in their treatment records, the Commonwealth did ask the court to make more emphatic its earlier suggestion that defense counsel be made subject to a protective order to prevent further disclosure of such information following defense counsel's review of those records (see *Commonwealth* v. *Figueroa*, *supra* at 203; *Commonwealth* v. *Stockhammer*, *supra* at 883), and supplied the court with a proposed model protective order to be used in connection with any inspection of privileged records under *Commonwealth* v. *Stockhammer*, *supra*.

confusion, frustration, inconsistency, busywork, and delay.[2] The practical shortcomings of these procedures for dealing with privileged records are well known to all who have had to try to use them.

At stake in these determinations is the correct resolution of two highly compelling but inherently conflicting interests — the complaining witness's desire to keep intensely personal treatment records confidential (and in particular to keep them from the person who perpetrated the sexual assault in the first place) versus the defendant's right to prepare and mount a defense (and in particular to uncover any inconsistent statements of or information about the complaining witness that would tend to show that the allegation of sexual assault is unreliable). The Legislature has accorded a privilege to many types of records

[2]The procedural history of the *Bishop* issues in this case offers one illustration of the confusion that still persists years after the adoption of the *Bishop* process. See *Commonwealth* v. *Bishop, supra* at 181-183.

As to busywork, given the stringent requirements that must be met to have the records in question summoned for in camera inspection under *Commonwealth* v. *Fuller*, 423 Mass. 216, 226 (1996), the remaining *Bishop* stages now appear to be of little (if any) utility. As required by *Commonwealth* v. *Fuller, supra*, records cannot now be summoned for in camera inspection unless the defendant has shown "a good faith, specific, and reasonable basis for believing that the records will contain exculpatory evidence which is relevant and material to the issue of the defendant's guilt," and that that evidence is not available elsewhere. In this context, the term "material" requires that the evidence from the records must "tend[] to create a reasonable doubt that might not otherwise exist." *Id.* at 227. Presumably, judges then examining records in camera will not release anything to defense counsel that does not also meet this same "more stringent" standard. *Id.* Yet, under the remaining stages and requirements of *Bishop*, counsel may not even share with the defendant this exculpatory evidence, that is not available elsewhere, absent a further written motion and a written memorandum and order from the judge. *Commonwealth* v. *Bishop, supra* at 182-183, 189. Defense counsel then needs to file yet another motion, and obtain yet another court order, before this exculpatory material, unavailable from any other source, may be introduced at trial. *Id.* at 183, 189. How, given the exculpatory (and unique) nature of the material released, could counsel adequately represent a defendant without sharing this material with the client and introducing it at trial? Put another way, why should busy trial judges, where one judge has already decided that the records contain exculpatory evidence that "tends to create a reasonable doubt that might not otherwise exist," be required to spend time reviewing additional motions and writing up decisions that state, as they must, that a defendant may see and use that exculpatory evidence?

that are often sought in prosecutions for sexual assault,[3] but the legislative creation of such privileges cannot trump a defendant's constitutional right to a fair trial. See *Commonwealth* v. *Bishop*, *supra* at 177, 182-183; *Commonwealth* v. *Stockhammer*, 409 Mass. 867, 883 (1991); *Commonwealth* v. *Two Juveniles*, 397 Mass. 261, 266-267 (1986). No matter how compelling the justification for the privilege, if honoring that privilege has the effect of depriving the defendant of his constitutional right to a fair trial, we must give higher priority to that constitutional right, not to the legislatively created privilege.[4] In any given case, determining whether the defendant's right to a fair trial will be denied by upholding the complaining witness's asserted privilege is a determination that requires an exceptionally difficult balancing of these diametrically opposed but compelling interests.

*Bishop* operates on the mistaken assumption that the correct resolution of such a difficult question will be assisted by processing it through a convoluted maze of procedural steps, each step having its own particular technical requirements.[5] The problem with such an approach is that, rather than improving the fairness and accuracy of the ultimate decision, the busywork of *Bishop* tends to trivialize the important interests at stake. Unnecessarily cumbersome procedures result in frustration and impatience, not in clarity of thought. I am unconvinced that the application of *Bishop* procedures have, in their practical effect, done anything to enhance the ability of trial judges to decide

[3]See, e.g., G. L. c. 233, § 20B (psychotherapist-patient privilege); G. L. c. 233, § 20J (sexual assault counsellor privilege); G. L. c. 233, § 20K (domestic violence victims' counsellor privilege); G. L. c. 112, § 129A (psychologist-patient privilege); G. L. c. 112, § 135A (social worker-client privilege).

[4]I agree with the concurring opinions of Justice Greaney and Justice Spina that these privileges are of immense importance to victims and witnesses and that there are "significant social consequences" to any overriding of such privileges. *Ante* at 193 (Spina, J., concurring). To say that a defendant's right to a fair trial is of greater weight merely recognizes, as it must, the paramount importance of that constitutional right. It does not, in any sense, belittle the compelling justification that underlies these privileges.

[5]In most cases, each step also has its own judge. Because so many trial court judges have rotating assignments in a circuit system, each of the successive steps necessary to resolution of any given *Bishop* motion is often handled by a different judge.

these motions for access to privileged materials correctly and fairly.

Far more troublesome than the mere practical burdens of *Bishop* is that these procedures ultimately fail to protect a defendant's right to a fair trial. The present case, which passed through the Stage Two of *Bishop* eight months prior to this court's decision in *Commonwealth* v. *Fuller, supra,* provides a disturbing illustration of how *Bishop* and *Fuller* will now operate to deprive defendants of access to exculpatory records and, ultimately, of their right to a fair trial. The Appeals Court and this court have both determined that the exclusion of the treatment records of the complaining witness in this case, which chronicled his difficulties distinguishing fantasy from reality, deprived this defendant of his right to a fair trial. *Commonwealth* v. *Sheehan,* 48 Mass. App. Ct. 916 (2000). However, had *Fuller* already been the law, this defendant's Stage Two affidavit would not have met the requirement that he demonstrate "a good faith, specific, and reasonable basis for believing that the records will contain exculpatory evidence that is relevant and material to the issue of the defendant's guilt," material evidence being defined in this context as evidence that "tends to create a reasonable doubt that might not otherwise exist."[6] *Commonwealth* v. *Fuller, supra* at 226. In other words, records

---

[6]The affidavit in support of the defendant's initial *Bishop* motion stated only that the complaining witness had received psychiatric counselling both prior and subsequent to the alleged assault, that the counselling records "may contain versions of the event" that would be "important for impeachment," "may reveal a propensity on the part of the complaining witness to lie," "may reveal a motive" for making false allegations, "may reveal a family history" giving rise to bias, and "may contain evidence that sheds light on the complaining witness' ability to perceive, recollect, and recall." This list of speculative possibilities as to what general categories of useful material the records "may contain" would certainly not suffice under *Commonwealth* v. *Fuller,* 423 Mass. 216, 226 (1996), and appears deficient even under the original, more lenient Stage Two *Bishop* standard. *Commonwealth* v. *Bishop, supra* at 182, quoting *People* v. *Gissendanner,* 48 N.Y.2d 543, 549 (1979) (court must deny request if "defendant's request is supported only by a desire to embark on an 'unrestrained foray into confidential records in the hope that the unearthing of some unspecified information would enable [the defendant] to impeach the witness' "). However, based on these conclusory assertions of materiality, the records of one provider were summoned to court, reviewed in camera, found to contain relevant information, and released to defense counsel. Those were the records that substantiated the complaining

that appellate courts have unanimously assessed as necessary to the defense would not, under the *Fuller* case, have even been summoned for in camera inspection. The irony of today's decision — ordering a new trial because the judge excluded treatment records that, under current law, the defendant would never be allowed to see — is disturbing.

This case, coming just on the cusp of *Fuller*, offers us a concrete example of how these procedures, as modified by *Fuller*, provide inadequate protection to a defendant's right to a fair trial. It is always difficult, and often impossible, to demonstrate what important exculpatory evidence is in documents that one has not seen. Here, the defendant was able to show us, from the records themselves, precisely how the information in those records was critical to his defense. Now, in the *Fuller* era, almost all such claims will be cut off at Stage Two, and we will never know what important exculpatory evidence went undiscovered because of a defendant's inability to demonstrate the significance of something he had not been allowed to see.[7]

Here, the defendant was the uncle of the complaining witness. Despite that relationship, a relationship that gave the defendant

---

witness's tendency to fantasize. Thereafter, the defendant learned that another provider had also counselled the complaining witness. The motion seeking access to those additional records was pending as of the date of this court's decision in *Commonwealth* v. *Fuller, supra,* and the defendant was therefore required to submit an affidavit that met the more stringent *Fuller* standard. The defendant was able to satisfy *Fuller,* but, ironically, he did so only by pointing to information in the treatment records he had already seen.

[7]The *Bishop* court was aware of this paradox, and apparently assumed that the Stage Two test was lenient enough to prevent any unfair consequence to defendants. "There is, of course, a danger in requiring the defendant to make too substantial a showing to justify piercing a privilege. A threshold requirement, so framed, could place the defendant in a 'Catch-22' situation. 'To gain access to the privileged records defendant must specifically allege what useful information may be contained in the target records. However, defendant has no way of making these specific allegations until he has seen the contents of the records.' *People* v. *Foggy,* [121 Ill. 2d 337, 359 (Simon, J., dissenting), cert. denied, 486 U.S. 1047 (1988)]. Such a requirement would produce a less-inclusive result in that possibly material, or even exculpatory, communications would remain undiscovered." *Commonwealth* v. *Bishop, supra* at 179 n.6. Despite that awareness, *Fuller* then imposed very stringent Stage Two requirements on defendants and, as this case illustrates, Stage Two now operates to produce the precise " 'Catch-22' situation" that the court had hoped to avoid. *Commonwealth* v. *Bishop, supra.*

at least some background knowledge of the complaining wit-
ness and his family, the defendant was unable to craft a Stage
Two affidavit that would even come close to meeting the
stringent *Fuller* test (see note 6, *supra*). He obtained the
exculpatory records on which we rely today only through the
fortuity that his affidavit was reviewed some months prior to
this court's *Fuller* decision. A defendant who is a stranger to
the complaining witness, or who has only a passing acquaintance
with the complaining witness, will never be able to meet the
*Fuller* test. That this defendant, despite the family relationship,
could not do so demonstrates how nearly impossible a test it is
to meet. This illustration, drawn from the case before us and not
from any abstract or extreme hypothetical, should give us pause.

The numerous pragmatic burdens of the *Bishop* procedures
would perhaps be tolerable if, in the final analysis, they led to
an appropriate balancing of the competing interests at stake.[8]
However, despite the inordinate burdens of *Bishop*, we will still
be unable to say with confidence that a defendant who has been
denied access to privileged records has had a fair trial. These
burdens are being imposed on the Trial Court, counsel,
defendants, complaining witnesses, and health care providers
for naught. In my view, *Bishop* is a failed experiment.[9] *Fuller*
has solved some of the pragmatic burdens of *Bishop* by the
simple expedient of making it almost impossible for any
defendant to satisfy Stage Two, but the high price to be paid for
that solution — depriving an unknown number of defendants of
their right to a fair trial — is unacceptable.

It is beyond the scope of this concurring opinion to recom-
mend particular remedies to the many shortcomings of *Bishop*

---

[8]I agree that "[i]t is not too much to ask trial judges to spend some of their
very valuable time on these important questions," (*ante* at 193 [Spina, J.,
concurring]), but we should not impose burdensome procedures that fail to
protect defendants' constitutional rights. Rather, we should strive to formulate
efficient procedures that enhance (rather than hinder) a trial judge's ability to
reach a correct and fair result when deciding such important privilege issues.

[9]The Trial Court now has eight years of experience operating under the
*Bishop* protocol. I do not think that *Bishop* is of such "recent adoption" (*ante*
at 191 [Greaney, J., concurring]) that it is premature to assess its effectiveness.
The protocol adopted in a unanimous decision of this court in *Commonwealth*
v. *Stockhammer*, 409 Mass. 867 (1991), was abandoned and completely
replaced only two years after its adoption. See *Commonwealth* v. *Bishop*,
*supra*.

and *Fuller* or to devise specific alternative procedures to substitute for *Bishop*.[10] I am convinced, however, that we can do better than we have done. I therefore concur in the result reached today, but hope that this court will soon have an appropriate opportunity to reconsider its adherence to these burdensome and constitutionally flawed procedures.

---

[10]I believe that it would be unwise to venture forth with any actual overhaul of *Commonwealth* v. *Bishop, supra,* in the absence of any briefing on the subject, and that endorsing some particular solution to the *Bishop* conundrum would be premature.