## COMMONWEALTH vs. VICTOR BRUCE.

No. 02-P-1607.

Middlesex. January 20, 2004. - July 15, 2004.

Present: ARMSTRONG, C.J., GREENBERG, & MILLS, JJ.

*Homicide. Evidence,* State of mind, Relevancy and materiality, Prior consistent statement, Verbal completeness, Impeachment of credibility, Intent, Medical record. *Practice, Criminal,* Instructions to jury. *Intent.*

At the trial of indictments charging murder and unlawful possession of a firearm, the judge did not abuse his discretion in prohibiting the defendant from introducing evidence that the victim purportedly possessed a firearm, where, at the time the defendant mortally wounded the victim, the victim posed no imminent threat of bodily harm to the defendant, and where the jury would not have been likely to conclude that the entire incident was merely reckless conduct or an accident even if the excluded evidence had been admitted. [478-480]

At the trial of indictments charging murder and unlawful possession of a firearm, the judge erred in admitting in evidence, on a rationale of "verbal completeness" and over the defendant's objection, one portion of a witness's prior grand jury testimony that was consistent with his trial testimony after defense counsel had used another portion of the witness's grand jury testimony to cast doubt on his credibility, where no circumstances existed to justify an exception to the rule prohibiting the admission of prior consistent statements, and where the statement used by defense counsel was entirely separable from the rest of the witness's grand jury testimony; however, the defendant was not prejudiced by the admission in evidence of the prior consistent statement, because the admission of the evidence had very slight effect in that it was cumulative of other evidence of the defendant's motive and intent. [480-483]

The judge at the trial of indictments charging murder and unlawful possession of a firearm, in instructing the jury as to some of the measures by which to assess the credibility of witnesses, did not err when he explained the concept of prior inconsistent statements but failed to mention impeachment by prior omission, where the judge's instruction was not dismissive of the defendant's argument that a particular witness was not credible, and where the judge's instruction neither misstated the law nor prevented the jury from considering omissions as inconsistencies. [483-485]

The judge at the trial of indictments charging murder and unlawful possession of a firearm did not err in instructing the jury on the concept of transferred intent, where there was evidence from which the jury could conclude that the defendant had intended to shoot one person but mistakenly shot the victim instead. [485-486]

There was no merit to the argument of a criminal defendant that the judge at his trial may have improperly withheld mental health records of a prosecution witness, where the defendant, whose counsel received some of the records before trial, did not advance any factual basis that indicated how the privileged records were likely to be relevant to an issue in the case and failed to complete the prescribed process for release of such records at the time of trial, and therefore waived any rights that he may have had on appeal. [486-487]

INDICTMENTS found and returned in the Superior Court Department on September 30, 1999.

The cases were tried before *Hiller B. Zobel*, J.

*Jane Larmon White*, Committee for Public Counsel Services, for the defendant.

*Afton M. Templin*, Assistant District Attorney, for the Commonwealth.

GREENBERG, J. Eighteen year old Victor Bruce was indicted by a Middlesex County grand jury for the murder of Earlyn Class, a thirty-five year old woman with whom he had had a brief stormy relationship. The murder was alleged to have been committed on September 10, 1999, when Bruce stood at the back door of Class's house in Everett and fatally wounded her by firing four bullets through the window of her kitchen door. Trial proceeded before a Superior Court jury on charges of murder in the first degree (G. L. c. 265, § 1) and unlawful possession of a firearm (G. L. c. 269, § 10[a]). At the end, the judge left it to the jury whether to convict on either of the degrees of murder or involuntary manslaughter (the defendant maintained that he was guilty of only manslaughter). The jury returned a verdict of murder in the second degree and a guilty verdict for unlawful possession of a firearm. The defendant has appealed both judgments of conviction.[1]

We give a condensed account of the case, thereby providing background for the defendant's points of law.

Earlyn Class met the defendant Bruce in June, 1999, through Lynn Beasley, her next door neighbor. Beasley was dating

---

[1]The defendant has made no argument on appeal concerning the conviction for unlawful possession of a firearm and so has waived any issue in regard to that conviction. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

Bruce's uncle. Despite a considerable age difference, they were instantly attracted to one another and, over the next few weeks, became intimate. In the spring of 1999, Class had ended an affair with Chris Wilson, a recruiter for the United States Army whose subordinate had enlisted one of Class's sons. At the time of her dalliance with Bruce, she was still friendly with Wilson, who spent much spare time visiting her at her house. It was clear from the trial evidence that Class did not want Wilson to know about her sexual involvement with Bruce.

Class's ardor for Bruce waned before the summer's end. We have Beasley's testimony claiming to have heard Class tell Bruce on the telephone that she had resumed her romantic relationship with Wilson. Beasley further claimed that she had discussed this with Bruce who, she said, told her he still wanted to continue his relationship with Class. As a scorned lover, Bruce did not acquit himself admirably. He began to harass Class with unwanted telephone calls and appearances outside her house.

There was considerable acrimony on September 9, 1999, the day before the shooting. Wilson and one of Class's neighbors were at her home, socializing and drinking beer on her back stoop. Without invitation, Bruce arrived and asked to speak with Class. A conversation ensued between the two of them that appeared to upset Class, who eventually retreated inside the house.

Bruce then recounted to Wilson sexually graphic details about his relationship with Class. By then, Class had come back outside and overheard some of the lurid conversation. She warned Bruce to "stop lying about her" and, in no certain terms, asked him to leave. Class became increasingly distressed by Bruce's crass talk and picked up a broken beer bottle in her hand, which one of the bystanders ended up taking from her. Again she told Bruce to leave, and began to walk toward the nearby police station. Bruce chased after her, attempting to block her path. Class was upset and crying. Wilson testified that he then accompanied Class back to her home. Bruce continued to hang around outside the house until late that evening, when a neighbor drove him to his job at Store 24. A series of annoying telephone calls from Bruce to Class continued into the wee hours of the morning.

Combining the testimony of Wilson, Class's neighbor Charles Campo, and Beasley, we have an account of the fatal shooting on the next day. Early in the evening, Bruce began calling Class. Wilson stopped by, asked Class if he could use her bathroom to shave his head, and went upstairs to complete the task. As he finished shaving, Wilson asked Class to help him with the back of his head.

A few minutes later, Bruce arrived outside the house. Campo testified that Bruce appeared agitated as he walked up the front steps to Class's house. He rang the bell, pounded on the door, and waited outside. When no one answered, he went next door to Beasley's house and pounded on her door. He returned to Class's house, picked up a planter from the front steps and hurled it against the door, smashing it into smithereens. Bruce circled around to the rear of the house and stood on the back steps. Just then, Wilson went to the window of the second-floor bathroom and looked down. He asked Bruce what was "up" and Bruce said, "Nothing, I need to speak to Earlyn. Tell her to come downstairs. I need to speak to her. Everything is cool." From a position at the same window, Class looked down and asked what Bruce wanted. He replied, "Everything is okay. Come downstairs."

Class turned away from the window and headed downstairs. Wilson finished collecting his belongings and followed her down the stairs to the threshold of the kitchen. From the inside, Class reached up to unbolt the door and, according to Wilson's testimony at trial, she pulled back the curtain that covered the door window and said, "You motherfucker." Bruce, who was over six feet tall, fired four shots from his .38 caliber revolver. They angled downwards through the bottom glass pane of the door. Pandemonium broke loose in the house. Class's daughter ran to her mother, who was lying on the kitchen floor, and asked her if she was alright. Class replied that she was okay and told her daughter to go back upstairs. Her daughter then ran upstairs, past Wilson, screaming to Wilson and her brother, "Mama been hit!" Class's daughter looked out the window to see Bruce running away from the back door. Class was transported to the hospital, where she died of multiple gunshot wounds less than an hour later.

After the Commonwealth presented its case, the defendant offered the testimony of his grandmother and his supervisor at Store 24. The latter testified that a woman resembling Class came to the store to speak with Bruce on September 8, 1999, two days before the shooting. After she left, Bruce seemed happy and laughed at his supervisor's jokes regarding romancing older women. His grandmother testified that around the time of the shooting, Bruce was living with her and that she observed Class frequently dropping by to pick him up and prepare food for him. From that, the jury could infer that everything was copacetic before the shooting. Bruce did not testify, but through cross-examination, his counsel established his theory of defense — that he did not know that Class stood behind the door when he fired and did not intend to shoot her.

1. *Exclusion of certain evidence offered to explain the defendant's conduct.* The prosecutor moved in limine seeking a ruling by the judge to prohibit defense counsel from introducing evidence that on the night before the shooting, Class purportedly possessed a firearm. Specifically, the prosecutor sought to preclude Bruce from calling two witnesses who supposedly told the Everett police that they had removed two guns from Class's home the evening before the shooting. Defense counsel offered two theories of admissibility: (1) to corroborate Bruce's postarrest statement (other portions of which were suppressed) that Class had pulled a gun on him the night before, and (2) as underpinning for his ultimate argument to the jury that he armed himself as a precautionary measure and harbored no intent to shoot Class. Understandably, the judge was skeptical concerning the relevancy of the evidence, as Bruce did not rely on self-defense and there was no evidence that Class was armed when she stood at the door and was shot by Bruce. Contrast *Commonwealth* v. *Noeun Sok*, 439 Mass. 428, 434 (2003), quoting from *Commonwealth* v. *Fontes*, 396 Mass. 733, 735 (1986) (a self-defense case in which the defendant could introduce evidence "of recent, specific instances of the victim's violent conduct, known to the defendant at the time of the homicide").

Initially, the judge declined to allow the motion and ruled that the evidence would be admissible if the prosecutor introduced Bruce's statement that Class had pulled a gun on

him. When defense counsel revisited the issue on the first day of trial, the judge allowed the prosecutor's motion and excluded the evidence over Bruce's objection. The judge did so after the prosecutor assured him that the Commonwealth would not introduce that portion of Bruce's statement, made at his arrest, regarding Class threatening him with a gun.

In the face of his conviction for murder in the second degree, Bruce argues that he was denied the opportunity to counter the almost inescapable inference that he carried a loaded weapon to Class's house because he intended to discharge it there, "to kill, to gravely injure someone, or to shoot up the house generally." Proof of any of these intents was required to make out malice, an essential element of the crime of murder in the second degree. See *Commonwealth* v. *Begin*, 394 Mass. 192, 197 (1985).

It is settled that a defendant may explain conduct that is incriminating on its face. See *Commonwealth* v. *Papadinis*, 23 Mass. App. Ct. 570, 572-573 (1987), *S.C.*, 402 Mass. 73 (1988), and cases cited. In homicide or assault and battery cases, the defendant may offer evidence of the victim's character for violence where the defendant asserts self-defense, but even in that instance, the defendant may do so only if there is a showing that he or she knew of the violent character before the incident in question. *Commonwealth* v. *Connolly*, 356 Mass. 617, 626, cert. denied, 400 U.S. 843 (1970). *Commonwealth* v. *Edmonds*, 365 Mass. 496, 499-500 (1974). In 1986, the Supreme Judicial Court adopted a new rule permitting the introduction of evidence of a victim's recent, specific acts of violence, known to the defendant at the time of the homicide, to prove that the defendant reasonably believed he or she was in imminent danger. *Commonwealth* v. *Fontes*, 396 Mass. 733, 735-736 (1986). The weakness in Bruce's argument here is that when he mortally wounded Class, she posed no imminent threat of bodily harm to him. In addition, defense counsel admitted during the hearing in the Commonwealth's motion in limine that the excluded evidence did not invoke any actual threat against Bruce by Class and was only a "small explanation" for his actions that night. See *Commonwealth* v. *Carroll*, 439 Mass. 547, 553 (2003) (where the excluded evidence was not relevant to

any "live issue" at trial, no abuse of discretion). For those reasons, the instant case is distinguishable from the *Papadinis* case upon which Bruce heavily relies. There, the excluded evidence (of the police officer victim's past violent conduct during a previous motor vehicle stop) went directly to the defendant's intent, when, during a routine traffic stop, he drove off and killed the officer by crushing him against a sign post. See *Commonwealth* v. *Papadinis, supra* at 572.

The question then is whether the exclusion of this marginally relevant testimony amounts to an abuse of discretion. See *Commonwealth* v. *Kosilek*, 423 Mass. 449, 458-459 (1996) (no abuse of discretion where the judge excluded evidence of the victim's use of physical force while disciplining her child in light of the limited probative value of that evidence). One has a sense from the evidence that Bruce was fortunate to avoid a conviction of murder in the first degree in that the jury would not be likely to conclude that the entire incident was merely reckless conduct or an accident even if the excluded evidence had been admitted. As the Commonwealth points out in its brief, it would not explain why he fired the gun four times when Class posed no actual threat to him at the time. See *Commonwealth* v. *Grace*, 397 Mass. 303, 305-306 (1986) (to grant a new trial, a judge must find there is "a substantial risk that the jury would have reached a different conclusion had the [excluded] evidence been admitted at trial").

Although not necessary to our conclusion on this point, it is apparent from the record that the jury did hear evidence concerning Class's threats toward Bruce and her brandishing a broken beer bottle the night before the shooting. And defense counsel was not precluded from mentioning in opening and closing statements several explanations as to why Bruce brought a loaded firearm to Class's house on the night in question.

2. *Prior consistent statements.* As a general rule, a witness's prior consistent statement may not be admitted in evidence. See *Commonwealth* v. *Jenkins*, 10 Gray 485, 488-489 (1858); *Commonwealth* v. *Zukoski*, 370 Mass. 23, 26 (1976); *Commonwealth* v. *Darden*, 5 Mass. App. Ct. 522, 527 (1977). That rule came in play on cross-examination of Wilson, who had testified that he saw Class pull back the curtain on the kitchen door's window

and heard her say "motherfucker" before she was shot (thus supplying evidence that Bruce knew that she was in front of the door before he fired the gun). On cross-examination, Wilson acknowledged that in his written statement at the police station (made about four hours after the shooting), and during his interview by a State trooper around the same time, he had not alleged that Class had pulled the curtain back, suggesting that it would have been impossible for Bruce to know that she was in the kitchen. Wilson further acknowledged on cross-examination that he had not told the police that Class had said to Bruce, "you motherfucker." Wilson's previous omission undermined the credibility of his trial testimony that Class had uttered this exclamation before being shot. Defense counsel also introduced a portion of Wilson's grand jury testimony that suggested Class had said "you motherfucker" *after* the first of the four gunshots.

On redirect, the prosecutor sought to rehabilitate Wilson's credibility by having him read another portion of his grand jury testimony that was consistent with his trial testimony that Class had pulled back the curtain before the first gunshot. The judge admitted this testimony over defense counsel's objection. The judge apparently believed Wilson's grand jury statements were admissible on a rationale of "verbal completeness" because defense counsel had already asked Wilson about other portions of his grand jury testimony. See *Commonwealth* v. *Crowe*, 21 Mass. App. Ct. 456, 478-479, cert. denied sub nom. *Pirrotta* v. *Massachusetts*, 479 U.S. 838 (1986); Liacos, Brodin & Avery, Massachusetts Evidence § 3.12, at 96-98 (7th ed. 1999). We disagree.

To the general rule of exclusion of prior consistent statements, there are, as might be expected, exceptions. If a prior inconsistent statement can be used to suggest that the trial testimony is the product of a peculiar and transient bias or prejudice of some kind, a prior consistent statement may be admitted to shore up the consistent in-court statement. See *Commonwealth* v. *Jenkins*, 10 Gray at 488-489; *Commonwealth* v. *Zukoski*, 370 Mass. at 26-27; and cases therein cited. This principle is not at play here. Wilson had testified as a witness for the prosecution both at the grand jury hearing and at the trial. He was a cooperative witness and had every reason to

want Class's killer convicted. Contrary to the belief of the judge below, the impeachment of a witness by prior inconsistent statements or omissions does not, standing alone, entitle the adverse party to introduce other prior statements made by the witness that are consistent with his trial testimony. See *Commonwealth* v. *Retkovitz*, 222 Mass. 245, 249-250 (1915). Further, there was no intimation by the defense that some event between the shooting and trial gave Wilson a motive to lie or change his testimony such that his statement to the grand jury could logically be found to rebut an argument of recent contrivance. Wilson would have had an understandable desire to give consistent testimony to assure the conviction of the person responsible for the death of his good friend. See *Commonwealth* v. *Binienda*, 20 Mass. App. Ct. 756, 759 (1985).

The judge's rationale for admitting the contested grand jury testimony on the basis of completeness fails to pass muster. The statement concerning the curtain was entirely separable from Wilson's other grand jury testimony. See *Commonwealth* v. *Pleasant*, 366 Mass. 100, 103 (1974); *Commonwealth* v. *Eason*, 427 Mass. 595, 598 (1998). We conclude that the judge exceeded the range of discretion in determining that the proferred grand jury testimony filled necessary gaps. The prior consistent testimony was mistakenly admitted.

Because it was error to admit this evidence over the objection of the defendant, we must decide whether he was prejudiced by the admission of the prior consistent statement in evidence. In order to rule the error harmless, we must be convinced that the error did not influence the jury or that it had very slight effect. *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 n.7 (1999). We believe the admission of the evidence would have had very slight effect on the jury's verdict because it was cumulative of other evidence of the defendant's motive and intent. The principal thrust of the defendant's argument is that Wilson's credibility as to what happened at the kitchen door just before the shooting was critical with respect to proof of malice. However, in addition to Wilson's disputed testimony, there was ample other evidence from which the jury could reasonably infer that the defendant knew Class was on the other side of the door when he fired the gun. The defendant stood outside the

back of the house, saw Class at the upstairs window, and called to her to come down because he wanted to talk to her. Whether she moved the curtain and said "motherfucker" before or after the first shot is of minimal import because he fired three more times at a nearly point blank range. Two of those bullets struck her. She was close enough to the glass-paned kitchen door to suffer lacerations from glass fragments striking her right breast and her shoulder area. Thus, the evidence, taken as a whole, permitted the jury to infer malice if for no other reason than that the circumstances known to the defendant at that moment in time would have brought home to a reasonably prudent person that there was a strong likelihood that death would follow this contemplated act. *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987).

3. *Jury instructions.* The judge instructed the jury as to some of the measures by which to assess the credibility of witnesses. He explained the concept of prior inconsistent statements but failed to mention impeachment by prior omission. Defense counsel, although not having requested such an instruction, objected at the conclusion of the charge. The judge, after speaking with counsel at sidebar, indicated that he understood the nature of the objection. He read counsel the Superior Court model instruction concerning prior inconsistent statements and asserted that he had been "faithful to the spirit, and . . . in some respect, the language of [the model instruction]." The model instruction does not contain any reference to impeachment by prior omission. The prosecutor expressed concern that further instruction on the point would unduly highlight the matter, and the judge declined to go further "unless [counsel could cite] a case that says differently." There was no further discussion.

The defendant now complains that the judge's charge on impeachment by prior inconsistent statements did not include any instruction concerning testimonial assertions omitted from prior statements. The question is a close one. The defendant argues that he is not advancing a novel definition of "prior inconsistent statements." However, with the exception of two decisions offered on the point, we have found no other relevant authorities. In *Commonwealth* v. *Ortiz*, 39 Mass. App. Ct. 70,

72-73 (1995), cited by Bruce, we reversed Ortiz's convictions for distribution of cocaine because the judge strongly implied in his instruction that omissions of important information from a police officer's report had no evidentiary value and could not be considered. We awarded a new trial because "the judge's remarks may well have led the jury to conclude that they should ignore the defendant's argument that the police officer . . . was not credible." *Id.* at 73. In the instant case, however, the judge's instruction was not dismissive of the defendant's argument that Wilson was not credible.

The other authority upon which the defendant relies, *Commonwealth* v. *Clayton*, 52 Mass. App. Ct. 198, 207 (2001), appears to be more on the mark. Clayton's conviction was reversed on other grounds and remanded for a new trial. The trial judge in *Clayton* showed no partiality to the Commonwealth's witness as the judge in *Ortiz* had done, but denied defense counsel's request for an instruction on impeachment by prior omission. We directed that the retrial jurors be specifically instructed on the precise point if it was required by the evidence developed at the retrial. Because we reversed Clayton's conviction on other grounds, however, we did not consider whether the jury instructions at the first trial, read in their entirety, were sufficient on this point and, if not, whether any error was prejudicial or harmless. *Id.* at 207. Therefore, the *Clayton* dictum does not govern the instant case.

In addition, the judge's instruction neither misstated the case law nor prevented the jury from considering omissions as inconsistencies. It is true that the judge's instruction did not explicate the difference between prior inconsistent statements and prior omissions. However, we have reviewed the charge as a whole and find that it accurately conveyed to the jury their role in assessing Wilson's credibility. See *Commonwealth* v. *Thomas*, 439 Mass. 362, 366-367 (2003). The judge listed a number of factors the jurors could consider. He specifically instructed the jury that they could consider whether the witness had ever said anything different from his testimony in court. In his closing argument, defense counsel very effectively argued that when Wilson was interviewed by the State police immediately after the shooting, "he gave an account of everything

he knew and saw . . . and there [are] two things he left out. Anything about the curtain, anything about a statement by Ms. Class." Bruce also benefited by the judge's charge, which omitted an instruction requested by the prosecutor that the jury could infer malice from the use of a dangerous weapon. See *Commonwealth* v. *Obershaw*, 435 Mass. 794, 808-809 (2002). In hindsight, it would have been more prudent to follow the course recommended in *Clayton*, but on this record we cannot say the error in not doing so requires reversal.

4. *"Transferred intent" instruction.* In instructing the jury on the third of three ways in which malice may be proved, see *Commonwealth* v. *Grey*, 399 Mass. at 470 n.1, the judge accurately tracked the Superior Court model instruction.[2] He advised them that malice, for purposes of murder in the second degree, may include an intent to commit an act in circumstances reasonably known to the defendant that present "a plain and strong likelihood of death even though perhaps death was not intended." In the middle of the charge, a juror responded to the judge's invitation to ask questions in order to clarify anything he had said. The juror asked whether "premeditation require[s] that the person actually kill the person that the [defendant] intended to kill." The juror posed this question more in the context of the premeditation element of murder in the first degree. Nonetheless the implication of the query, in this context, was that the juror was confused by proof of the defendant's ill will toward Wilson as well as Class. Before answering the question, the judge conducted a sidebar conference with both

---

[2]The applicable portion of the Superior Court model instruction on murder reads as follows:

"Malice, for purposes of murder in the second degree, also includes 3) an intent to do an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death will result. Under this third meaning of malice, you must decide whether, based on what the defendant actually knew at the time (he/she) acted, a reasonable person would have recognized that (his/her) conduct created a plain and strong likelihood that death would result. In determining whether the Commonwealth has proved this third meaning of malice, you must consider the defendant's actual knowledge of the circumstances at the time (he/she) acted."

1 Massachusetts Superior Court Criminal Practice Jury Instructions § 2.4 (Mass. Continuing Legal Educ. 1999).

counsel. He proceeded to give a correct explanation of transferred intent as articulated in *Commonwealth* v. *Puleio*, 394 Mass. 101, 109-110 (1985), and *Commonwealth* v. *Drumgold*, 423 Mass. 230, 259 (1996). There was no objection registered by either counsel.[3]

On appeal the defendant asserts that giving this instruction was error because there was no evidence by which the jury could find transferred intent, e.g., evidence that he intended to shoot Wilson but mistakenly shot Class instead. That being the case, the defendant's argument, citing *Commonwealth* v. *Fickett*, 403 Mass. 194, 198-199 (1988), is that the jury's general verdict must be voided because it is impossible to determine the theory on which the jury reached its verdict of guilty.

We disagree. Defense counsel, in opening statement and in cross-examination of Beasley, suggested that the defendant had threatened violence against Wilson, Class's former lover. Wilson was present inside the house at the time of the killing and the defendant knew it. As we have recounted, Wilson stood perilously close to the kitchen at the time the shots were fired. Thus, the defendant's contention that there was no evidence from which the jury could infer transferred intent fails. The question is not whether the jury convicted the defendant of murder on the wrong theory. To the contrary, we think there was a sufficient basis here for the judge to exercise his considerable discretion to answer the juror's question on transferred intent in the manner in which he did.

5. *Withholding of records.* The defendant complains for the first time on appeal that the trial judge may have improperly withheld mental health records of Lynn Beasley, Class's neighbor, who appeared as a witness for the prosecution in the instant case. While the indictments against Bruce were pending, his uncle was being prosecuted for sexually assaulting Beasley. In that unrelated proceeding, a request for records of Beasley's treatment at a mental health facility were the subject of a discovery request in accordance with *Commonwealth* v. *Bishop*, 416 Mass. 169, 180-183 (1993). Defense counsel in the instant

---

[3]At the sidebar conference, defense counsel did state: "I don't think there is an issue of transferred intent here. . . . I wish you would just reinstruct on what deliberate premeditation is."

case asked to "join" in that *Bishop* motion by attaching the identical materials to a "Motion to Compel Production of Records Pertaining to Witness." Eventually the trial judge conducted an in camera review of Beasley's records and, prior to trial, indicated that there were some portions of the record that he was inclined to disclose to defense counsel. See *Commonwealth* v. *Sheehan*, 435 Mass. 183, 187 n.8 (2001). Those records were released to defense counsel shortly before trial. For reasons that are not apparent from the record, defense counsel took no further steps and failed to offer any of the records at trial. On appeal Bruce requests that we review the portion of Beasley's records withheld from the defense to determine whether they contain information that might have assisted the defense.

Since Bruce did not "advance . . . at least some factual basis which indicate[d] how the privileged records [were] likely to be relevant to an issue in the case," *Commonwealth* v. *Bishop*, 416 Mass. at 180, and failed to complete the process at the time of trial, he waived any rights that he might have had on appeal. See *Commonwealth* v. *Green*, 52 Mass. App. Ct. 98, 102 (2001) (defendant waived double jeopardy defense that he failed to raise at time of trial).

*Judgments affirmed.*