NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11719


COMMONWEALTH  vs.  EDWIN MAZARIEGO.



Worcester.      January 12, 2016. - March 31, 2016.

Present:  Gants, C.J., Spina, Cordy, Duffly, & Lenk, JJ.


Homicide.  Felony-Murder Rule.  Rape.  Constitutional Law,
    Voluntariness of statement, Waiver of constitutional
    rights.  Evidence, Voluntariness of statement, Inflammatory
    evidence, Prior misconduct.  Practice, Criminal, Capital
    case, Motion to suppress, Voluntariness of statement,
    Argument by prosecutor, Postconviction relief, Duplicative
    convictions.



Indictments found and returned in the Superior Court
Department on June 14, 2010.

A pretrial motion to suppress evidence was heard by James
R. Lemire, J., and the cases were tried before David
Ricciardone, J.


Kathleen M. McCarthy for the defendant.
Susan M. Oftring, Assistant District Attorney, for the
Commonwealth.


SPINA, J.  The defendant was convicted of murder in the

first degree on a theory of felony-murder, based on the

predicate felony of aggravated rape.  He also was convicted of

aggravated rape, and he was sentenced to concurrent terms of life in prison. On appeal, the defendant asserts error in (1) the denial of his motion for a required finding of not guilty; (2) the denial of his separate motions to suppress two statements he made to police; (3) the admission in evidence of emotional testimony from the victim's daughter; (4) the admission of evidence of the defendant's prior bad acts; (5) improper closing argument by the prosecutor; and (6) the denial of his postconviction motion to reduce the verdicts to rape and felony-murder in the second degree. We affirm the convictions of murder in the first degree and order dismissal of the aggravated rape conviction as duplicative. We decline to exercise our power under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.

1. Background. The jury could have found the following facts. We reserve other details for discussion of particular issues.

Walter Martinez lived with his father, Rafael Martinez, on Benefit Street in Worcester in August, 2006. Rafael owned the house. He rented one room to Julio Mancias, Walter's cousin, and another room to the defendant, Mancias's friend. On August 18, 2006, at about 10:20 P.M., Walter saw Mancias and the defendant talking to the victim in the hallway of their home. At about 11 P.M., Rafael was driving home and saw Mancias with

two other people, one a woman, standing at the corner of Benefit and Beacon streets.  About two or three hours later, Rafael heard a knock at a window.  It was Mancias and the defendant.  They asked Rafael to let them in.  When Rafael opened the door they ran into the house and went directly to Mancias's room.  They appeared agitated and closed the door behind them.  The next morning, the victim's body was discovered by police near train tracks in the vicinity of Benefit Street.  She was naked below the waist, her legs were spread apart, and her blood-soaked shirt and sweater were pulled up.  Her face was bloody.  Three bloody rocks ranging in weight from 11.17 pounds to 12.82 pounds were recovered near her body.  A condom also was found near her body.

About one month later, the defendant invited Walter to his room for a beer.  The defendant told him that he and Mancias had been with a woman and that they had killed her in the basement of the Benefit Street house.  The defendant said Mancias actually killed her by repeatedly hitting her on the back of her head until she "dropped dead."  He said they moved her body from the basement of the house to some nearby train tracks.  Walter later confronted Mancias with what the defendant had told him.  Mancias admitted that he had killed the woman, and told Walter that the victim was a prostitute and there had been a problem over money.  An individual unconnected to those mentioned above

initially was charged with the victim's murder, but deoxyribonucleic acid (DNA) testing excluded him as the perpetrator. The case remained unsolved for nearly four years.

In an unrelated case, a group of men fired shots at Walter, Mancias, and the defendant in 2007. Mancias was killed, Walter was paralyzed, and the defendant escaped unharmed. During a pretrial meeting in that case in February, 2010, Walter told the prosecutor and a detective about his conversations with the defendant and Mancias in 2006. As a result, a Spanish-speaking detective interviewed the defendant on April 29, 2010, after first advising him of the Miranda warnings. The defendant said he understood his rights and agreed to speak to the detective. The detective showed the defendant a photograph of the victim. The defendant said she did not look familiar.

A second interview took place on May 17, 2010, preceded by the Miranda warnings. The defendant said he understood his rights and agreed to speak to the detective. He admitted that he had lied on April 29 when he said he did not recognize the victim. The defendant said she was not killed in the basement, but at the location where she was found. He first said that he saw Mancias with the victim at about 1 A.M. on the night she was killed, and did not see him again that night until about 3 A.M. At that time Mancias told him that he wanted to have sex with the victim, but he could not because it was too cold and the

victim did not want to have sex.  Later in that conversation, Mancias told the defendant that he had killed the victim because she would not have sex with him.  According to the defendant, Mancias also said that he had killed her with some rocks.  The defendant denied being present when the victim was killed, and he denied having sexual relations with her.

After further questioning on May 17, the defendant admitted that he was with Mancias and the victim.  He said that he went with the victim first, that they both had removed their pants, that he had positioned himself on top of her, and she insisted on being paid.  Because he had no money, he then hugged her, put on his pants, and went over to Mancias.  He said he told Mancias that the victim did not want to have sex because he had no money.  The defendant denied having sexual relations with the victim.  He explained that sexual "relations" are when one "finish[es]," and he did not "finish."  Mancias told him to act as a lookout in case the police came.  The defendant said that he went behind some bushes while Mancias took his turn.  He heard screams and he heard the hits.  He said that he did not see Mancias hitting the victim, but later said that he did see Mancias hitting her with rocks, at which point he fled.

A forensic pathologist's testimony supported findings that the victim died from blunt trauma to the head and that she had been manually strangled, possibly before the head trauma.

Vertical drips of dried blood on her legs suggested that the victim had been injured while she was standing. Examination of her external genitalia revealed a dry and red chafing-type abrasion to the inner folds of the labia of recent origin, that is, between one day and seconds before death. The abrasions were consistent with vaginal penetration. Neither sperm nor seminal fluid was detected on swabbings from the victim's mouth, vagina, and rectum. A vaginal swab tested positive for blood.

DNA test results supported findings that the victim's DNA matched the major DNA profile in a mixture of biological material on one of the rocks found at the scene, and that Mancias was a potential contributor of the minor DNA profile in the mixture. A mixture of biological material from the interior of the condom was subjected to DNA testing. The defendant matched the major DNA profile, and the victim was included as a potential contributor of the minor DNA profile. Mancias was excluded as a source of the DNA mixture from the interior of the condom. A DNA mixture on the exterior surface of the condom was tested. The victim matched the major DNA profile in the mixture, and the defendant was included as a potential contributor of the minor DNA profile.

2. <u>Motion for required finding</u>. The defendant contends that the judge erred in three respects in denying his motion for a required finding of not guilty. He argues that the evidence

was insufficient as to the issues of (1) penetration and lack of consent; (2) aggravating factors for aggravated rape; and (3) whether the killing occurred during the commission of a rape or aggravated rape for purposes of felony-murder. The decision to grant or deny a motion for a required finding is a question of law. In reviewing the sufficiency of the evidence we consider the evidence in the light most favorable to the Commonwealth and ask if any rational trier of fact could have concluded that the Commonwealth met its burden of proof as to the essential elements of the crime charged. See Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). A fact finder may rely on common experience to draw inferences. Id. at 678. Inferences need not be necessary. Id. at 678-679. "It is enough that [they] be reasonable and possible" (emphasis added; citation omitted). Commonwealth v. Marquetty, 416 Mass. 445, 452 (1993).

a. Penetration and lack of consent. The Commonwealth must prove some degree of penetration, Commonwealth v. King, 445 Mass. 217, 221-222 (2005), cert. denied, 546 U.S. 1216 (2006), and it must prove that such penetration occurred by threat of force and against the will of the victim, Commonwealth v. Sherry, 386 Mass. 682, 687 (1982).

The defendant contends that no rational fact finder could have found beyond a reasonable doubt that he penetrated the victim for purposes of rape, and that it was against the will of

the victim.  He bases his argument on the following evidence: he only hugged the victim because she would not allow him to have intercourse unless he first paid her; the relatively recent abrasions on the inner folds of the victim's external labia could have been one day old and were consistent with several possible causes other than penetration; testimony from the Commonwealth's pathologist that science could not determine the cause of the abrasions; the evidence that no seminal fluid or sperm cells were detected on any of the swabbings of the victim; and it could not be determined how the victim's DNA was deposited on the condom found at the scene.  The defendant has distorted the Latimore analysis by casting the evidence in the light most favorable to himself.

A jury could have found beyond a reasonable doubt that the element of penetration had been established based on evidence that the defendant's DNA matched the major DNA profile of the biological material from the interior of the condom; that the victim's DNA matched the major profile of the biological material on the exterior surface of the condom; that in his statements to Rosario the defendant lied about his involvement and made incremental disclosures of his participation in the incident; that the defendant admitted being on top of the victim when they were both naked below the waist; that the abrasions to the victim's external labia were consistent with forceful

penetration; and that penetration could be inferred from the defendant's statement that he did not have sexual relations with the victim because he did not "finish," which a jury could infer to mean that the defendant penetrated but did not experience orgasm. Separately, these facts would not warrant a finding of penetration, but together, they possess a synergy that supports a finding of the element of penetration. See Phillips v. Chase, 201 Mass. 444, 448 (1909) ("When circumstantial evidence is largely relied upon to establish an issue, it is inevitable that many matters should be introduced which by themselves alone would be immaterial, although in connection with other evidence they may be helpful in discovering the truth").

Additionally, a jury could have found that where the defendant acknowledged that the victim made it clear that she did not want to have intercourse unless she were paid in advance and that she had not been paid, the defendant had nonconsensual sexual intercourse with the victim, and that he did so with force. The judge properly denied the defendant's motion for a required finding of not guilty to the extent that the Commonwealth made out a prima facie case of rape.

b. Aggravated rape. The defendant next contends that there was insufficient evidence to support a verdict of guilty of the crime of aggravated rape. Aggravated rape is rape "[a] committed with acts resulting in serious bodily injury, [b] or

is committed by a joint enterprise, [c] or is committed during the commission or attempted commission of" certain specified offenses not relevant here. G. L. c. 265, § 22 (a). We are concerned only with the first two alternatives, which are intertwined in this case. A jury could have found the defendant guilty on both alternatives based on the evidence that he and Mancias both planned to have intercourse with the victim; that they went to a location where the defendant previously had taken prostitutes; that the defendant had no money to pay the victim; that he did not ask Mancias to pay the victim; that neither of them had money to pay the victim nor the intention to pay her for sexual intercourse; that the defendant acted as a lookout while Mancias hit the victim with heavy rocks; that the defendant observed the killing; that after the victim collapsed one or both men raised her bloody shirt and sweater to expose her breasts and one or both men spread apart her legs; that they fled together and arrived together at the Benefit Street house where they rented rooms; and that the defendant told Walter that "they" killed the victim.

A jury could infer the existence of a joint venture from the circumstances, including engaging a prostitute for intercourse without having any money or intention to pay; the defendant positioning himself as a lookout during the beating, see Commonwealth v. Hanwright, 466 Mass. 303, 313 (2013); the

evidence that Mancias and the defendant fled together, see Commonwealth v. Williams, 422 Mass. 111, 121 (1996); and from the other circumstances. "The relevant question is whether the evidence would permit a jury to find guilt, not whether the evidence requires such a finding." Commonwealth v. Lydon, 413 Mass. 309, 312 (1992), quoting Commonwealth v. Brown, 401 Mass. 745, 747 (1988). A jury had sufficient evidence from which they could conclude that the defendant raped the victim as part of a joint venture based on the evidence that he was present at the scene, with knowledge that either or both men intended to have nonconsensual sexual intercourse with the victim, and that the defendant was willing and available to help Mancias if necessary, the elements of a joint venture. See Commonwealth v. Zanetti, 454 Mass. 449, 455 (2009).

Moreover, a jury had ample basis to find that serious bodily injury was inflicted on the victim by Mancias while the defendant was acting as his lookout. The jury were not required to believe the defendant's statement that he had disengaged from the joint venture, but that he remained with Mancias and that they left the scene together. The judge did not err in denying the defendant's motion for a required finding of not guilty as to the crime of aggravated rape. See Commonwealth v. Lynch, 428 Mass. 617, 622 (1999).

c. <u>Felony-murder</u>. Last, the defendant contends that the evidence was insufficient to establish beyond a reasonable doubt that the killing occurred during the course of the predicate felony, here, aggravated rape. "[F]or purposes of felony-murder, the homicide and predicate felony 'need only to have occurred as part of one continuous transaction'; and [the] connection is sufficient 'as long as the [predicate felony] and the homicide[] took place at substantially the same time and place.'" <u>Commonwealth</u> v. <u>Gunter</u>, 459 Mass. 480, 488, cert. denied, 132 S. Ct. 218 (2011), quoting <u>Commonwealth</u> v. <u>Ortiz</u>, 408 Mass. 463, 466 (1990). Where the jury could have found that the defendant and Mancias had engaged in a joint venture to rape the victim, that the defendant acted as a lookout for Mancias, and that contrary to the defendant's assertion, he had not disengaged from the joint venture, Mancias's killing of the victim constituted felony-murder for which the defendant could be convicted under a theory of joint venture. There was no error in the denial of the defendant's motion for a required finding of not guilty.

3. <u>Suppression issues</u>. The defendant argues that the two statements he made on April 29, 2010, and the one on May 17, 2010, should have been suppressed on grounds that he did not understand his Miranda rights, that he did not properly waive his Miranda rights, and that the statements were not made

voluntarily.  On April 29 the defendant was transported from the Worcester County House of Correction, where he was being held on an unrelated matter, to the Worcester police station.  The first statement on April 29 consisted of a pretrial interview of the defendant with respect to the shooting case in which he was an apparent target.  The second interview concerned the instant matter.  On May 17 the defendant again was transported from the Worcester County House of Correction to the Worcester police station.  That interview concerned the instant case.  The three interviews were video recorded and were conducted in Spanish, as the defendant speaks little English.[1]  Detective Daniel Rosario of the Worcester police department, who speaks Spanish, conducted all the interviews.  Transcripts of the interviews were translated into English, and no question has been raised as to the accuracy of either the transcripts or the translations. The first interview on April 29 began at approximately 7:20 P.M. and ended at approximately 8:45 P.M.  The second interview on April 29 lasted approximately one hour and ten minutes.  There was a break of about twenty-five minutes between the two interviews on April 29.  The May 17 interview lasted approximately two hours and eleven minutes.

---

[1] Because the interviews were conducted in Spanish, the video recordings were not played to the jury.  Instead, portions of English translations of the transcriptions of the audio portion of the recordings were read to the jury.

The defendant filed a pretrial motion to suppress these statements. His motion alleged that all three statements should be suppressed because they "were not preceded by a knowing and intelligent waiver of Miranda rights," and because they "were involuntary." The statement of most concern to the defendant was the one that he made on May 17 because it contained admissions relevant to this case. The defendant's theory for suppression had two components, and it was complex. First, at the beginning of the initial interview on April 29, during the Miranda advisement, the defendant asked, "[O]n whose side is the attorney?" He argued in his supporting memorandum of law that the question demonstrated the defendant's ignorance of the role of an attorney for purposes of Miranda rights, and because his question was never answered on the record, his waiver of Miranda rights could not have been knowing and intelligent as to any of the statements, all of which were preceded by a Miranda advisement that he never understood.[2] Second, the interrogation

---

[2] The defendant challenges on appeal the trial judge's refusal to consider this issue, which the defendant renewed in a motion in limine filed on the first day of trial. The trial judge determined that he was bound by the decision of the motion judge, who considered the same issue. Contrary to the defendant's assertions, he raised precisely the same issue in his memorandum of law in support of the motion to suppress. The trial judge's ruling was correct. See Commonwealth v. Haskell, 438 Mass. 790, 792-793 (2003); Commonwealth v. Marmolejos, 35 Mass. App. Ct. 1, 3 (1993). We will treat the issue as having been decided by the motion judge, and the matter will receive full appellate review.

techniques employed during the second interview on April 29 were so coercive as to render any statement he made at that time involuntary, and their effect on the defendant did not dissipate with time but instead continued to resonate and carried over to May 17, rendering the May 17 Miranda waiver and the May 17 statement, as well as the second April 29 statement, involuntary. This argument also was set forth in the defendant's memorandum of law in support of his motion to suppress.

The motion judge conducted an evidentiary hearing on the motion to suppress at which the defendant testified about the effects that Detective Rosario's interrogation of April 29 had on him during the May 17 interview. After reviewing the video recordings of the three interviews and the translations of the transcripts, the motion judge concluded that the defendant "knowingly, voluntarily and intelligently waive[d] his Miranda rights before being interrogated on each of the three occasions."[3] The motion judge also found the defendant's testimony about the coercive effects of the second April 29 interview to be "not credible," and he concluded that all three statements given by the defendant were voluntary.

---

[3] The parties do not dispute the judge's conclusion that all three interviews were custodial interrogations.

a.  Miranda issues.  The path of the litigation of the Miranda issues took an unwieldy turn, to which we alluded in note 2, supra.  On the first day of trial, after learning that the prosecutor intended to offer portions of the defendant's second statement from April 29 (there were no admissions, but the prosecutor wanted the jury to hear what details of the investigation had been shared with the defendant), the defendant filed a motion in limine seeking to exclude both statements made on April 29, essentially tracking the theories that had been made in the motion to suppress.  In his supporting memorandum of law, and for the first time, he claimed that he invoked his right to silence at the beginning of the second interview on April 29.  Based on discussions with counsel, the trial judge assumed that the issue had been decided by the motion judge.  Unfortunately, no one alerted the trial judge to the arguments made by the defendant in his memorandum of law in support of the motion to suppress.  Had that been done, the judge would have seen that the claim of invocation of the right to silence was new, and that he might have had discretion to consider it.  See Mass. R. Crim. P. 13 (a) (5), as appearing in 442 Mass. 1516 (2004); Commonwealth v. Haskell, 438 Mass. 790, 792-793 (2003); Commonwealth v. Marmolejos, 35 Mass. App. Ct. 1, 3 (1993).  Because resolution of this question can be made by reviewing the video recordings of the interviews and by reviewing the

translations of the transcripts of the interviews, we are in the same position as was the trial judge, and we make our own independent judgment about the facts and the legal analysis. See Commonwealth v. Clarke, 461 Mass. 336, 340-341 (2012).

i. Knowing waiver. The defendant first contends that the Commonwealth has not shown that he knowingly waived his Miranda rights. During the Miranda advisement preceding the first interview on April 29 the defendant asked in response to the Miranda warning regarding the appointment of an attorney, "[O]n whose side is the attorney?" The defendant contends that this question, which never was answered, demonstrates that he did not understand the Miranda warning about the right to an attorney, and therefore he could not have waived his Miranda rights knowingly and voluntarily. He further contends that this lack of understanding about the role of an attorney at the first advisement on April 29 remained unexplained and carried forward as to all other advisements, namely, the second advisement on April 29 and the advisement on May 17.

Although the defendant claims that he did not understand the role of an attorney in the Miranda context, and that the question he asked went unanswered, the record belies his assertions. The record reflects that when Detective Rosario started to explain the Miranda warnings in response to the defendant's question about the role of an attorney, the

defendant interrupted him. Rosario had begun his explanation by saying, "the most important thing is that you have the right to remain silent. In other words, you don't have to talk to me if you don't want to. Do you understand?" The defendant immediately interjected, "No, but if it's about making a statement, I'll give you a statement, because it's my family." Rosario said: "But, do you want me to explain or do you understand me all right?" The defendant replied: "No, I understood you." Nevertheless, Rosario continued: "You can give up the right I just read to you, to an attorney and your right to remain silent, and you can answer any question or make any statement that you want to, do you understand?" The defendant replied, "Yes." Rosario continued: "If you decide to answer the questions, again, you can stop at any time to consult with an attorney. Do you understand more or less?" The defendant indicated that he understood and agreed to speak to Rosario. We are satisfied that, when Rosario explained that the defendant could stop questioning at any time to consult with an attorney, his explanation was adequate, the defendant accepted the explanation, and the defendant indicated that he understood his rights.

We have viewed the video recordings and considered the translations of what was said during each of the three interviews. We conclude that, in the totality of the

circumstances, the defendant received, understood, and then knowingly and intelligently waived his Miranda rights before each interview.  See Commonwealth v. Edwards, 420 Mass. 666, 670 (1995).

ii.  Invocation of right to silence.  The defendant next argues that he exercised his right to remain silent at the beginning of the second interview on April 29.  This issue was raised for the first time in a motion in limine filed on the first day of trial, as discussed in note 2, supra.  At the end of the first interview on April 29 the defendant asked, "You're still going to continue interviewing, aren't you?"  After a short break and at the beginning of the second interview on April 29 Detective Rosario asked the defendant what he meant by his question at the end of the previous interview.  The defendant mentioned being taken back to the house of correction. It appears that Rosario thought that the defendant meant he wanted to keep talking in order to delay being sent back.  He asked the defendant if he wanted to continue talking.  The record indicates the defendant laughed and said, "No, no, no." The context reveals that when he laughed and said, "No, no, no," the defendant was signaling Rosario's misunderstanding.  Indeed, in the very next exchange, the defendant said, "Yes, it is fine," in response to Rosario's request to begin the interview

by advising the defendant of the Miranda warnings.[4]  The

defendant did not exercise his right to remain silent.

b.  Voluntariness.  The defendant next argues that his

May 17 statement was the product of coercive police

interrogation techniques employed during the second April 29

interview.  We begin with the second April 29 interview.

Contrary to the defendant's claim, Rosario did not misrepresent

to the defendant that if he did not tell his side of the story

at that time, he would not later be able to tell it to a jury.

Contrast Commonwealth v. Novo, 442 Mass. 262, 268-269 (2004).

Rosario essentially told the defendant that it was his

opportunity to "explain it to me" and that it was important to

Rosario that the defendant be truthful at that time.

Rosario engaged in some deception, telling the defendant

that because their conversation was being recorded, he (Rosario)

could not lie to the defendant.  That is not a correct statement

of law.  The use of trickery or deceitful tactics, while

disfavored, does not necessarily compel suppression, but is a

factor to be considered when deciding if, in the totality of the

---

[4] We note that the trial judge determined, essentially on grounds of relevance and fairness, that the only portion of the second interview on April 29 that could be admitted in evidence was the defendant's statement, when shown a photograph of the victim, that he had never before seen her.  In his May 17 statement the defendant acknowledged he had not been truthful on April 29 when he said he had never seen the victim before.

circumstances, a confession is voluntary.  See Commonwealth v. DiGiambattista, 442 Mass. 423, 432-433 (2004).

Rosario also employed the technique of minimization, suggesting that the defendant's mere presence did not mean that he killed someone.  This was a correct statement of law, but it could be misleading.  Significantly, Rosario made no assurance of leniency, so we consider the use of this technique to be a factor that should be considered when determining whether, in the totality of the circumstances, a confession is voluntary. Id. at 437-439.

The defendant also cites Rosario's inquiry about whether the defendant was a religious person.  When the defendant said he was, Rosario told him, "You can hide from us, but you cannot hide from God."  However, it was not Rosario who first broached the subject of an Almighty observer.  In response to Rosario's question whether the defendant helped Julio Mancias move the victim's body from the basement of the house to the railroad tracks, the defendant said he did not, adding, "God is up there. I am not lying."  Rosario continued with the theme of divine guidance, telling the defendant that he was being offered a tremendous opportunity to be truthful now, otherwise he would "have a very long time to ask yourself:  why is it that when God gave me the opportunity to tell the truth I just remained quiet?"  And later, "[twenty-eight] years old.  Are you prepared

to spend the rest of your life in jail?" Unmoved, the defendant replied, "Whatever God wants." We consider this aspect of the interrogation to be a factor in the assessment of the question of voluntariness. As with other factors, it alone is not determinative.

Detective Rosario also used the ploy of being the defendant's "brother," specifically, sharing a common bond of Hispanic ancestry and culture. The defendant did not take the bait.

Although some of Rosario's interrogation techniques warrant our concern, none of them, either individually or in combination, appears to have overborne the defendant's will. See Commonwealth v. Tremblay, 460 Mass. 199, 206-207 (2011). Indeed, as the motion judge found, "the defendant held his ground and would not concede when [Rosario] tried to suggest that he played more of a role in [the victim's] death." We have viewed the video recording of the second April 29 interview, and we agree with the motion judge. The defendant laughed or chuckled at Rosario sixteen times. He yawned once. The defendant held fast to his denials about involvement in a killing in the basement at Benefit Street. Rosario had information that the killing occurred there, but in fact it did not occur there, and the defendant knew as much. The defendant had the superior position as to the details of the killing, and

the calm he maintained during the interview, often with his arms crossed with confidence, is entirely understandable. Significantly, Rosario also maintained his composure throughout the interview, never raising his voice, never taking an aggressive attitude, and engaging the defendant in a conversational tone at all times. Rosario did not overbear the will of the defendant during the second interview on April 29.

Finally, we turn to the question whether the alleged coercive nature of the second interview on April 29 smoldered in the defendant's mind such that it adversely affected his waiver of Miranda rights on May 17, and whether it rendered the defendant's May 17 statement involuntary. The motion judge specifically addressed these issues in his decision on the defendant's pretrial motion to suppress evidence. Not only did the motion judge view the video recordings of all the interviews and the translations of transcriptions of all the interviews, but the defendant testified at the hearing. Specifically, he testified about how Rosario's statements made him feel. The judge found the defendant's testimony "not credible." The judge found the May 17 interview to be "an attempt [by the defendant] to minimize his role in the crimes and was the product of his rational intellect. He had the opportunity to reflect on the facts he had received from the police and made a decision to try to address these facts by providing information that tended to

diminish any culpability on his part." We defer to the judge's findings of credibility and fact based on testimony that he witnessed, and that we did not. See Commonwealth v. Hoose, 467 Mass. 395, 399 (2014). We have conducted our own "independent review of the judge's application of constitutional principles to the facts found," id. at 400, including a review of all the video recordings and the translations of those recordings, and we conclude that in the totality of the circumstances, the defendant made a knowing and voluntary waiver of his Miranda rights on May 17, and that his statement of May 17, which included a piecemeal unfolding of his involvement in the crime, was given voluntarily. There was no error in the denial of the defendant's motion to suppress.

4. Testimony from victim's daughter. The defendant objected to testimony from the victim's daughter, who described their immediate family and briefly described the date and circumstances when she last saw the victim and how she learned of her death. The defendant argues this was irrelevant and an improper appeal to sympathy. The testimony comprised but five pages of the transcript. The judge gave an immediate limiting instruction, telling the jury that the testimony was "not an appeal to sympathy or emotions," but was offered "to give you some background on the person, the decedent." The prosecutor did not refer to the testimony in closing. Some limited

biographical detail may be given to humanize a victim, and the testimony here fell within permissible limits, especially when its use could not be used to engender sympathy or an emotional response to the evidence. See Commonwealth v. Holliday, 450 Mass. 794, 816, cert. denied, 555 U.S. 947 (2008). There was no error.

5. Evidence of prior bad acts. The judge admitted evidence of the defendant's past history of bringing prostitutes to the area of Benefit Street on the issue of motive, intent, state of mind of the defendant, or lack of mistake on August 18-19, 2006. The defendant timely objected, and now argues that the evidence was irrelevant and prejudicial evidence of bad character and propensity. Evidence of prior bad acts may not be admitted to show bad character or a propensity to commit crime. "[S]uch evidence may be admitted, if relevant, to show a common scheme or course of conduct, a pattern of operation, absence of accident or mistake, intent or motive." Commonwealth v. Barrett, 418 Mass. 788, 793-794 (1994). The evidence showed that on three prior occasions the defendant had had sexual relations with three prostitutes in the vicinity where the victim was killed. The judge immediately gave a limiting instruction tracking the language of Barrett. The evidence was relevant to show the defendant's intent, similarities in the location where he took prostitutes, and absence of mistake,

namely, that the defendant knew that he brought no money to a transaction that he must have known would require payment of money, and that having no money was probative of the defendant's intent to have sexual intercourse with a prostitute without paying the requisite fee. It also was relevant to show that the defendant had more than passive involvement in the planning of the incident, where he was familiar with the particular location of the crime and his past use of that location for engaging prostitutes. There was no error.

6. Prosecutor's closing. The defendant asserts that the prosecutor improperly misstated evidence, referred to facts not in evidence, and improperly appealed to juror sympathy. See Commonwealth v. Kozec, 399 Mass. 514, 516-517 (1987).

The prosecutor referred to the abrasion on the victim's labia as "[f]resh." The defendant asserts that this was a misrepresentation of the evidence. The prosecutor did not misrepresent the evidence. The Commonwealth's pathologist testified that these abrasions were recent, and she gave a time range for their cause as being from a day before death to hours, minutes, or even seconds before death. The pathologist's opinion was expressed in isolation of the other evidence in the case. The prosecutor's selection of a point in time within the range expressed by the pathologist, as illuminated by other evidence in the case, was fair, reasonable, and proper. A

prosecutor is permitted to make arguments of this nature to assist the jury in analyzing the evidence and to suggest conclusions they should draw from the evidence. See Commonwealth v. Johnson, 429 Mass. 745, 750 (1999).

The prosecutor argued initially that the fresh abrasions to the labia were "in the area of [the victim's] vagina," and that these abrasions, "coupled with the blood found inside her vagina, tells us the defendant didn't hug [the victim]. He raped her." This argument was properly grounded in the evidence. The prosecutor later misspoke, saying, "The injuries to her vagina and the blood inside of it tell us that." The defendant objected at the conclusion of the prosecutor's argument. The defendant contends this was prejudicial error requiring reversal. The judge acknowledged that the injury to the vagina was a "misstatement," but not one that "amount[ed] to impropriety." The judge immediately instructed the jury generally that if either lawyer said anything that did not concur with the jury's recollection of the evidence, the jury's memory controlled. Although the prosecutor's reference to an injury to the victim's vagina, rather than injury to the labia and blood found in the victim's vagina as he previously argued properly, was error, we think that it was not prejudicial. The element of penetration does not require proof of vaginal penetration, but may be met by evidence of a touching of the

labia.  See Commonwealth v. Donlan, 436 Mass. 329, 336 (2002);
Commonwealth v. Gichel, 48 Mass. App. Ct. 206, 213 (1999).
Here, the Commonwealth's pathologist testified that the injury
to the labia was consistent with penetration.  The manner in
which the judge addressed the issue was adequate.

The defendant next argues that the prosecutor impermissibly
appealed to juror sympathy when he argued that the defendant and
Mancias fled together, "leaving [the victim's] body on the side
of those tracks, as if she weren't even a human being, as if she
were the litter we saw walking around [during the] view."
Defense counsel objected at the end of the prosecutor's argument
and asked that the "litter" comment be struck and the jury
instructed.  The judge overruled the objection, stating that the
prosecutor did not cross the line.  We doubt that the
prosecutor's needless comment had the effect of sweeping the
jurors beyond a fair and calm consideration of the evidence, see
Commonwealth v. Smith, 387 Mass. 900, 905 (1983), and we
continue to credit jurors with that "certain measure of . . .
sophistication in sorting out excessive claims," Commonwealth v.
Kozec, 399 Mass. at 517.  Regrettably, we cannot say the same
for those prosecutors who seem bent on interjecting low grade
drama into their closing arguments.  Here, the jury did not
quite feel the prosecutor's passion, given that they found the
defendant not guilty of murder committed with extreme atrocity

or cruelty.  This single reference was not so inflammatory as to require a new trial.  Commonwealth v. Judge, 420 Mass. 433, 452 (1999).

Finally, the defendant argues that the prosecutor argued facts not in evidence when he said, "[The victim] died so the defendants could cover up the rape they had just committed and what they had done.  And they ran up the hill afterwards together . . . ."  The defendant contends there was no evidence to support this theory.  There was no objection.  There was evidence to support a finding of aggravated rape by joint venture, that the defendant acted as lookout for Mancias, and evidence from which the jury could have found that they fled together.  The prosecutor was entitled to marshal the evidence "in favor of his client."  Commonwealth v. Johnson, 374 Mass. 453, 459 (1978), S.C., 409 Mass. 405 (1991).  The argument, although not one that flows inevitably from the evidence, asked the jury to draw an inference that was "reasonable and possible" (citation omitted).  Commonwealth v. Marquetty, 416 Mass. at 452.  Moreover, the absence of an objection to this statement from vigilant defense counsel is some indication that the comment did not land a foul blow that was unfairly prejudicial. See Commonwealth v. Toro, 395 Mass. 354, 360 (1985).  We conclude that the argument did not create a substantial

likelihood of a miscarriage of justice. Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

7. Motion to reduce verdicts. The defendant moved postverdict, pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), to order entry of findings of not guilty or, alternatively, to order entry of verdicts on lesser included offenses. The motion was denied, and the defendant appeals from the denial of his motion. A judge's decision to exercise the broad powers conferred by rule 25 (b) (2)[5] is reviewed for abuse of discretion or error of law. Commonwealth v. Lyons, 444 Mass. 289, 291 (2005). We do not substitute our judgment for that of the trial judge. Other than arguing the facts of the case in the light most favorable to himself, the defendant has not shown that the judge abused his discretion.

8. Review under G. L. c. 278, § 33E. We have reviewed the entire record, the briefs, and heard oral argument, and conclude that there is no reason to reduce the degree of guilt or order a new trial. However, the conviction on the indictment alleging aggravated rape is duplicative of the conviction of felony-murder and must be dismissed. See Commonwealth v. Lopes, 455 Mass. 147, 148 (2009).

---

[5] We have likened the broad powers of a trial court judge under Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), to our powers under G. L. c. 278, § 33E. See Commonwealth v. Keough, 385 Mass. 314, 319 (1982), quoting Commonwealth v. Goulden, 383 Mass. 543, 555 (1981).

9.  <u>Conclusion</u>.  The judgment of conviction of murder in the first degree is affirmed, as is the denial of the postverdict motion under rule 25 (b) (2).  The matter is remanded for entry of an order dismissing as duplicative the conviction on the indictment alleging aggravated rape.

<u>So ordered</u>.