NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12179

COMMONWEALTH  vs.  MARCELO ALMEIDA.


Plymouth.     January 9, 2018. - May 17, 2018.

Present:  Gants, C.J., Budd, Cypher, & Kafker, JJ.


Homicide.  Evidence, Prior misconduct, Prior inconsistent
    statement, Consciousness of guilt.  Practice, Criminal,
    Capital case, Argument by prosecutor, Instructions to jury.



Indictment found and returned in the Superior Court
Department on December 19, 2011.

The case was tried before Thomas F. McGuire, Jr., J.


Amy M. Belger for the defendant.
Audrey Anderson, Assistant District Attorney, for the
Commonwealth.


KAFKER, J.  The defendant, Marcelo Almeida, stabbed the

victim numerous times with a knife, causing her death.  After a

jury trial, the defendant was convicted of murder in the first

degree on the theories of deliberate premeditation and extreme

atrocity or cruelty.

In his appeal, the defendant claims that reversal of his

conviction is required because the judge erred by (1) allowing evidence of a prior bad act in which the defendant waited outside the victim's bathroom with a knife and later stated that he would have killed her if she opened the door; (2) permitting the prosecutor to comment in her closing argument on omissions in the defendant's statement to a police officer, which the defendant contends were not inconsistent with the defendant's trial testimony and were caused by the officer's statements that he should discontinue speaking with police officers; and (3) failing to provide sua sponte a jury instruction addressing the omissions, and providing, over the defendant's objection, a consciousness of guilt instruction. For the reasons stated below, we conclude that the trial judge did not err. After a thorough review of the record, we also decline to exercise our authority under G. L. c. 278, § 33E, to reduce or set aside the verdict of murder in the first degree. Therefore, we affirm the defendant's conviction.

Background. We summarize the facts that the jury could have found, reserving certain details for discussion of the legal issues.

The defendant and victim were involved in a relationship together. Both came to the United States from Brazil and lived with a mutual friend, Lucas Ferreira, in an apartment in Marshfield. The defendant and victim also had a child together,

who lived in Brazil with the child's grandmother.

In the summer of 2011, trouble within the relationship escalated as the defendant and the victim fought verbally on numerous occasions. In July, 2011, while living with the defendant, the victim and the defendant engaged in a fight that resulted in the victim locking herself in the apartment bathroom. The defendant then knocked on the door and banged his head against a wall, telling the victim to open the door. After this incident, the victim left the defendant's apartment and moved into her aunt's house. The next day, the defendant telephoned a mutual friend and said, "[T]hank God [the victim] didn't open the door because I would have kill[ed] her because I had a knife in my hand." The defendant also told another mutual friend about the incident, stating that when the victim was in the bathroom, he "took a knife" and "was going to kill her."

In late July and August, 2011, while the victim was living with her aunt, the defendant repeatedly telephoned the victim, asking the victim to move back into his apartment. In one telephone call with the victim, the aunt overheard, on speakerphone, the defendant say that if the victim did not return, he "would kill her" and her mother and their son in Brazil. In another telephone call directly to the aunt, the defendant said "he wanted [the victim] to return, and if she didn't return, he would kill her."

In late August, 2011, after living with her aunt for approximately three weeks, the victim moved back into the defendant's apartment.  Approximately two weeks later, the defendant and victim had another argument during which the defendant took the victim's belongings, threw them into the living room of the apartment, and told the victim to leave, stating that "he didn't want her anymore."

Following this argument, the victim once again moved out of the defendant's apartment and moved into her friend's apartment, which was located downstairs in the same apartment building. While the victim was moving into her friend's apartment, the defendant saw the victim and called her names including "snake" and "prostitute."

After the victim's move, the defendant continued to contact the victim every day, often calling the victim on the telephone more than ten times a day.  Sometimes the victim would answer; most of the time she did not.  During this time, the defendant frequently telephoned mutual friends, as well as the victim's mother, who still lived in Brazil.  In one of the telephone calls to the victim's mother, the defendant threatened to kill the victim, stating that he "was going to buy a gun to kill her," but then that he would kill her with a knife.  Despite these statements, the defendant repeatedly tried to convince the victim and others that he loved the victim and wanted the victim

to move back in with him.

On the Saturday before the victim's death, which was approximately three weeks after the victim moved into her friend's apartment, the defendant invited the victim to go to a rodeo with him, but the victim declined. The next day, Sunday, September 25, the defendant saw the victim at a friend's house and again asked if she would attend the rodeo with him. The victim told the defendant to "go on with his life" and that their relationship "would not work out." That day, the victim went to the rodeo with two other men.

The defendant remained at the friend's house, where he consumed more than twelve beers. Additionally, the defendant testified that he consumed cocaine that night for the first time. While at the house, the defendant went outside with his housemate, Ferreira, and explained that the victim had lied to him about going to the rodeo. The defendant then told Ferreira that he was "going to do something crazy" and that "he felt like killing [the victim]," repeating this statement more than once. The defendant also stated that "what he was going to do, not even his own mother would forgive him" and that "he knew that he would never see his son and that his family [would] never forgive him." In response, Ferreira said that "there was no need for [the defendant] to do that, he had a beautiful son, that [the victim] is from a good family." The defendant replied

that he "could not promise." At trial, Ferreira testified that he had no difficulty in understanding the defendant, and that the defendant appeared agitated, sad, and "pissed off."

That same afternoon, the defendant made a telephone call to a mutual friend of the victim, telling the friend, "Thank you very much. Thank you for everything. Thank you very much for everything. I'm sorry. Thank you and I'm sorry." On hearing this statement from the defendant, the friend tried telephoning the victim five times, but she was unsuccessful.

Later that evening, the defendant attempted to find the victim and speak with her. Unable to find the victim, the defendant telephoned the victim 232 times throughout the night, but never spoke to her.

The next day, Monday, September 26, the defendant saw the victim at the apartment building. As the victim was leaving for work, the defendant stabbed the victim eleven times, causing the victim's death. An autopsy of the victim revealed that the victim suffered numerous stab wounds with a sharp object, leading to severe blood loss and the death of the victim.[1]

---

[1] During the autopsy, a sexual assault kit detected sperm cells on the victim, indicating that the victim had had sexual relations. The evidence was admitted through the testimony of the forensic scientist who analyzed the sexual assault kit. The trial judge initially did not allow the evidence of the results of the sexual assault kit, as the evidence was not relevant. The defendant then testified that the victim told him she had

After stabbing the victim with a knife, the defendant sliced his neck, threw the knife into the stairwell, and proceeded back to his apartment. Following this, the defendant obtained another knife from his apartment and then proceeded out of the apartment. The defendant headed towards the exit of the apartment building and passed by two friends telling them that he "killed [the victim]" and that he "did it for love." He then left the apartment building carrying the second knife, which he used to stab himself in an attempted suicide. The defendant subsequently ran into nearby woods and discarded the knife. The defendant was later found in a shed by the State police and handcuffed. While in custody, the defendant was transported to a local hospital to treat his injuries.

At the hospital, the defendant was guarded by State police Troopers Robert Lima and Brian Galvin and had one wrist handcuffed to the hospital bed. Soon after entering the defendant's hospital room, Lima read the defendant the Miranda rights in Portuguese, the defendant's native language. The defendant signed the Portuguese-translated Miranda form. The

---

been with another man, prompting the prosecutor to renew the request to admit the evidence. The judge subsequently determined that the fact that sperm was found was relevant, but only because it was probative as to whether the victim said she had sexual relations with another man. Because of this, the judge limited admission of the evidence solely to the fact that sperm was found.

defendant then told Lima that he would talk.  In response, Lima, in Portuguese, told the defendant that Galvin had spoken with the defendant's attorney, who advised the defendant not to speak.  The defendant then said he did not want to make any statements.

Approximately one-half hour after receiving the Miranda warnings, the defendant began speaking to Lima in broken English.  The defendant talked about his brother in Brazil and his deceased sister and that he had twelve siblings.  The defendant stated that he worked at a pizza shop and loved living in the United States.  Then speaking in Portuguese, the defendant told Lima that he has multiple children, "one of which doesn't even know him," and then stated, "[W]hat did I go do . . . . I killed my woman."  Lima testified that the defendant was upset and began crying.  In response, Lima told the defendant to stop talking, reminded the defendant in Portuguese that the defendant had been read his rights, and reminded the defendant that he, Lima, was a police officer.  After this statement, the defendant said he "just wanted to talk to [Lima]."  Lima testified that the defendant appeared very alert and cognizant of his surroundings and that he was aware of what he was saying.  Lima estimated that the exchange with the defendant lasted approximately two to three minutes.

Regarding the interaction between Lima and the defendant,

defense counsel asked Lima on cross-examination:

> Q.: "So did [the defendant] ever tell you when he did this act to his girlfriend?"
>
> A.: "No, sir."
>
> Q.: "Or how he did this act to his girlfriend?"
>
> A.: "He did not."
>
> Q.: "Or why he did this act to his girlfriend?"
>
> A.: "He did not."

Then in closing argument at trial, the prosecution commented on the defendant's exchange with Lima, arguing:

> "And then he tells him, what did I do?  I killed my woman.  Don't hear anything at that time about because she cheated on me.  Don't hear anything about because she told me she had sex with another man or that she'd been with another man.  Don't hear any of that in that moment."

The defendant testified at trial.  He stated that he loved the victim and knew he "lost [his] life" as a consequence of his actions.  The defendant testified that while arguments occurred between him and the victim, the fights were never physical. When questioned about the bathroom incident, the defendant conceded that he banged his head against the wall, but denied having a knife.

The defendant testified that, on the day the victim died, the victim knocked on the defendant's apartment door, and the victim and defendant proceeded to walk downstairs towards the building exit together.  The defendant believed that the victim

was going to leave for work without talking to him, so the defendant went back to his apartment and got a knife.  The defendant testified that he got the knife in order to slash the victim's tires so that she could not leave and would therefore talk to him.  The defendant returned to the stairway with the knife.  The defendant testified that the victim told him she did not love him anymore and that she had been with another man.  The defendant testified that, on hearing this statement, he stabbed the victim numerous times.

Discussion.  1.  Admission of prior bad act evidence.  At trial, defense counsel objected to the admission of the evidence of the incident in which the defendant held a knife outside the bathroom door of the victim.  It was the day after this incident that the defendant called a friend and said, "[T]hank God [the victim] didn't open the door because I would have kill[ed] her because I had a knife in my hand."  At trial, the basis for the objection to the bathroom incident evidence was improper foundation.  The defendant now contends that this prior bad act evidence should not have been admitted, as its probative value was outweighed by its unfair prejudicial effect.

As the grounds for objection on this issue that were raised on appeal differ from the objection made at trial, the standard of review that applies to this claim is whether there was a substantial likelihood of a miscarriage of justice.  See

Commonwealth v. Lyons, 426 Mass. 466, 473 n.12 (1998) (error objected to on ground different from that raised on appeal; proper standard of review is substantial likelihood of miscarriage of justice). We discern no error.

"Evidence of a defendant's prior or subsequent bad acts is inadmissible for the purpose of demonstrating the defendant's bad character or propensity to commit the crimes charged." Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). See Mass. G. Evid. § 404(b)(1) (2018). "However, such evidence may be admissible for some other purpose, for instance, 'to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or pattern of operation.'" Crayton, supra, quoting Commonwealth v. Walker, 460 Mass. 590, 613 (2011). See Mass. G. Evid. § 404(b)(2). "Even if the evidence is relevant to one of these other purposes, the evidence will not be admitted if its probative value is outweighed by the risk of unfair prejudice to the defendant." Crayton, supra. See Mass. G. Evid. § 404(b)(2).

Here, the evidence of the defendant holding a knife outside the bathroom door is highly probative of the hostile relationship between the victim and the defendant, and his state of mind. See Commonwealth v. Butler, 445 Mass. 568, 575 (2005) (prior bad act evidence properly admitted to show hostile nature of relationship); Commonwealth v. Cordle, 404 Mass. 733, 744

(1989), S.C., 412 Mass. 172 (1992) (prior bad act evidence admissible to show relationship between defendant and victim). The evidence shows that the victim and the defendant had a continuously hostile relationship with numerous arguments.

The evidence also reveals the defendant's intent, as even he connected the bathroom knife incident to an intention to kill the victim, telling friends that he would have killed the victim with a knife. See Commonwealth v. Mazariego, 474 Mass. 42, 56 (2016) (prior bad act evidence properly admitted to show defendant's intent). Finally, this evidence was relevant to whether the defendant had an intention to kill the victim regardless of whether he had been informed that she had been with another man.[2] Such evidence was thus relevant to the critical issue of premeditation or provocation. See Commonwealth v. Pagan, 440 Mass. 84, 87-88 (2003) (prior bad act evidence admissible to show hostile nature toward victim and premeditation of subsequent killing); Commonwealth v. McGeoghean, 412 Mass. 839, 841, 844 (1992) (prior bad act evidence admissible to show intent, supporting finding of premeditation).

The judge also provided a limiting instruction to the jury

---

[2] At trial, the defense argued that the defendant was provoked by the victim in an attempt to mitigate the charge of murder in the first degree.

regarding the prior bad act evidence when it was offered and again in his final charge, thus minimizing any prejudicial effect.[3]  See Commonwealth v. Forte, 469 Mass. 469, 480 (2014) (no error in admission of prior bad act evidence where, among other things, jury instructions minimized potential for prejudicial effect); Commonwealth v. Donahue, 430 Mass. 710, 718 (2000) (proper jury instructions can render potentially prejudicial evidence harmless).

We therefore conclude that the judge did not abuse his discretion in admitting the evidence of the prior bad act.

2.  Use of post-Miranda statements and omissions.  In the

---

[3] The judge provided the following contemporaneous limiting instruction:

"We just had some testimony about a prior incident between [the victim] and the defendant in which the defendant, according to this witness, had a knife and indicated that he felt that he could use it.  That evidence is not admitted for the purpose of proving that the defendant had a criminal propensity, a propensity to commit crimes.  It's being admitted solely to give you, the jurors, an understanding of the relationship between [the victim] and the defendant."

Prior to jury deliberations, the judge again provided a limiting instruction regarding the prior bad act:

"You may not take that evidence as a substitute for proof that the defendant committed the crime charged; that is, the murder.  Nor may you consider it as proof that the defendant has a criminal personality or bad character.  However, you may consider it solely for the limited purpose of understanding the nature of the defendant's relationship with [the victim] at the time of the alleged murder.  You may not consider this evidence for any other purpose."

instant case, the defendant voluntarily made statements to Lima after receiving Miranda warnings.  Those statements were made spontaneously and not in response to interrogation. Commonwealth v. Loadholt, 456 Mass. 411, 420, (2010), S.C., 460 Mass. 723 (2011).  Finally, those statements were inconsistent with the defendant's trial testimony, as facts alleged at trial were omitted from the prior statements.

The defendant challenges the propriety of the following portion of the prosecutor's closing argument:

> "And then he tells him, what did I do?  I killed my woman.  Don't hear anything at that time about because she cheated on me.  Don't hear anything about because she told me she had sex with another man or that she'd been with another man.  Don't hear any of that in that moment."

"[W]here, as here, a defendant voluntarily makes post-Miranda statements, and then testifies at trial, in order to expose inconsistencies and differences in testimony, a prosecutor may inquire into [and comment on] 'the omission[s] from a [defendant's] pretrial statement[s] where it would have been natural to include the omitted fact[s].'"  Commonwealth v. Guy, 441 Mass. 96, 106 (2004), quoting Commonwealth v. Rivera, 425 Mass. 633, 639 (1997).  See Commonwealth v. Perez, 460 Mass. 683, 699 (2011), quoting Commonwealth v. Ortiz, 39 Mass. App. Ct. 70, 72 (1995) (omission from earlier statement may be used to impeach witness when "[the] omission from the earlier statement is inconsistent with a later statement of fact" and

"it would have been natural to include the fact in the initial statement").  See also Mass. G. Evid. § 613(a).[4]

The defendant contends, nonetheless, that the prosecutor should not have been permitted to comment on what the defendant did not say because as soon as the defendant confessed to killing the victim, Lima told the defendant to stop talking. The defendant further contends that the reason the defendant killed the victim would not naturally have been said in these circumstances to Lima and that, therefore, nothing the defendant voluntarily said or did not say was incompatible with his trial testimony.

We disagree.  Despite numerous warnings, the defendant spoke freely; he was, in the words of the prosecutor, a "talker."  As exemplified by his numerous statements to his friends, he regularly spoke what was on his mind regardless of the consequences.  At the hospital, the defendant also appeared to be reaching out to Lima, speaking with Lima about various subjects, including the defendant's family in Brazil, particularly his brother who was a police officer; his current

---

[4] The defendant also challenges various statements made by the prosecutor during closing argument, including misstatements of fact and improper requests to the jury to consider what they heard while on the view of the murder scene.  To the extent that the prosecutor did make improper remarks during closing argument, the judge addressed these issues during the jury charge, providing curative instructions to the jury.

employment; his love for and residence in the United States for five years; and his children, including a son that did not know him. Even following a second warning given by Lima about the right to remain silent, the defendant still spoke, stating that he "just wanted to talk."

In these circumstances, if the killing was provoked as a result of the defendant learning that the victim had "been with another man," it is reasonable to infer that the time the defendant would have made this known was when the defendant made his statement to the police. See Commonwealth v. Donovan, 58 Mass. App. Ct. 631, 639 (2003). The defendant's statements were extensive enough to make the absence of any discussion about the defendant's alleged provocation conspicuous. Id. It was in this expansive context that the defendant said, "[W]hat did I go do . . . . I killed my woman." Therefore, it was not improper for the prosecutor to comment on this significant omission and draw the jury's attention to these inconsistencies, especially given the theory that the defense presented in closing argument.[5]

Even if improper, the prosecutor's comments would not have created a substantial likelihood of a miscarriage of justice. The Commonwealth presented overwhelming evidence of the

---

[5] We note that only defense counsel inquired as to what was not said by the defendant in his cross-examination of Lima. The issue was thus first raised by the defense.

defendant's premeditation.  The defendant, on numerous occasions over the course of several months and the days leading up to the murder, told family and friends of the victim that he wanted to kill the victim; that "what he was going to do, not even his own mother would forgive"; and that he "was going to do something crazy."  This included the previous knife incident in the bathroom.  All of these statements were made prior to the defendant's alleged knowledge that the victim had been with another man.  Consequently, the prosecutor's comments on the omission, even if improper, would not have changed the jury's finding that the killing was the result of the defendant's preexisting intent to kill.  See Commonwealth v. Littles, 477 Mass. 382, 391 (2017) (even where there was error in jury instruction, error was found harmless when juxtaposed to strength of Commonwealth's case).

3.  Jury instructions.  The defendant argues that it was error for the trial judge to (1) fail to give sua sponte an instruction on impeachment by prior omission as part of the prior inconsistent statement instruction and (2) give a consciousness of guilt instruction.  We address each in turn.

a.  Impeachment by prior omission.  Because there was no objection at trial to the jury instructions, we review this claim of error for a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Kosilek, 423 Mass. 449, 452

(1996). We conclude that the better practice would have been to include language concerning omissions in the prior inconsistent statement instruction, but that the instruction given here was adequate and not error. See, e.g., Commonwealth v. Simmonds, 386 Mass. 234, 242 (1982) (court references omissions in considering prior inconsistent statements); Commonwealth v. West, 312 Mass 438, 440 (1942) (same); Commonwealth v. Ortiz, 39 Mass. App. Ct. 70, 72 (1995) (same).

This issue has been raised in two Appeals Court cases. In Commonwealth v. Clayton, 52 Mass. App. Ct. 198, 207 (2001), the defendant requested a jury instruction on prior inconsistent statements that included language concerning omitted statements. However, the trial judge's charge on impeachment by prior inconsistent statements did not include any instruction on omissions. Id. In that case, because the defendant's conviction was reversed on the basis of the trial judge's exclusion of relevant evidence, the Appeals Court did not consider whether the charge was sufficient on this point and, if not, whether any error was prejudicial or harmless. See id.

In Commonwealth v. Bruce, 61 Mass. App. Ct. 474, 484 (2004), the Appeals Court decided the question, concluding that the judge's instruction on prior inconsistent statements was adequate, as it neither misstated the case law nor prevented the jury from considering omissions as inconsistencies. Although

the judge's instruction in Bruce did not integrate omissions into the prior inconsistent statement instruction, the Appeals Court reviewed the prior inconsistent statement instruction and the over-all charge as a whole and found that it accurately conveyed to the jury their role in assessing the witness's credibility. Id.

We likewise conclude that the prior inconsistent statement instruction here adequately explained the issue to the jury.[6] See Bruce, 61 Mass. App. Ct. at 484. We thus discern no error. That being said, we reiterate that the better practice is to instruct on omissions in the prior inconsistent statement instruction where omissions are at issue.[7]

---

[6] The judge provided the following instruction:

> "Now, as a general rule, we allow witnesses to testify in court and we exclude out-of-court, prior out-of-court statements by witnesses. There have been some prior out-of-court statements by witnesses used in this case. One example is a prior inconsistent statement. If a witness testifies in court, an attorney is permitted to ask the witness, well, isn't it true that you testified inconsistently, differently, on a prior occasion, or you gave a statement out of court on a prior occasion which is different from what you're saying now. In that case, the out-of-court statement is not admitted as substantive evidence. You're not allowed to base your verdict on it. It's introduced to assist you in judging whether or not you believe the in-court testimony. That's the purpose of it."

[7] If omissions are at issue, the better practice would be to include an instruction along the following lines: "A prior inconsistent statement is one that, either by what it says or by what it omits to say, affords some indication that the fact was

b.  Consciousness of guilt.  The defendant objected to the consciousness of guilt instruction, claiming that there was no evidence of flight and no dispute that the defendant had killed the victim.[8]  Here, given that there was evidence of the defendant's flight from the scene, we discern no error in the judge's instruction and conclude that the judge acted within his discretion in deciding, over the defendant's objection, to give

different from the testimony of the witness whom it is sought to contradict.  An omission from the earlier statement is inconsistent with a later statement of fact when it would have been natural to include the fact in the initial statement."  See Commonwealth v. West, 312 Mass. 438, 440 (1942); Commonwealth v. Ortiz, 39 Mass. App. Ct. 70, 72 (1995).

[8] The judge instructed the jury:

"We've also had evidence in the case that the defendant fled from the scene of the incident.  If the Commonwealth has proven the defendant did flee from the scene, you may consider whether such actions indicate feelings of guilt by the defendant and whether, in turn, such feelings of guilt might tend to show actual guilt of the charge.  You are not required to draw such inferences and you should not do so unless they appear to be reasonable in light of all the circumstances of this case.  If you decide that such inferences are reasonable, it will be up to you to decide how much importance to give them.  However, you should always remember that there may be numerous reasons why an innocent person might do such things.  Such conduct does not necessarily reflect feelings of guilt.  Please also bear in mind that a person having feelings of guilt is not necessarily guilty in fact, for such feelings are sometimes found in innocent people.  Finally, remember that standing alone, such evidence is never enough by itself to convict a person of a crime.  You may not find the defendant guilty on such evidence; that is, evidence of flight from the scene, by itself.  But you may consider it in your deliberations along with all the other evidence."

an instruction on consciousness of guilt.

The judge properly determined that a consciousness of guilt instruction served a "useful and proper purpose" because "although the killing has been admitted, [it was] still the Commonwealth's burden to prove guilt of murder." Commonwealth v. Morris, 465 Mass. 733, 740 (2013). See Commonwealth v. Stuckich, 450 Mass. 449, 453 (2008) (consciousness of guilt instruction permissible where there is evidence of flight). The judge also took careful steps to preserve the neutrality of the instruction by highlighting that innocent people do engage in flight, and that such conduct does not necessarily reflect feelings of guilt. Morris, supra.

4. Review under G. L. c. 278, § 33E. We have reviewed the record pursuant to G. L. c. 278, § 33E, and discern no basis to set aside or reduce the verdict of murder in the first degree or to order a new trial. Accordingly, we decline to exercise our authority.

Judgment affirmed.