NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

20-P-1108                                          Appeals Court


COMMONWEALTH  vs.  TIMOTHY HAYES.


No. 20-P-1108.

Suffolk.      December 13, 2022. - March 28, 2023.

Present:  Green, C.J., Meade, & Blake, JJ.


Trafficking.  Prostitution.  Deriving Support from Prostitution.
    Money Laundering.  Joint Enterprise.  Evidence, Joint
    enterprise.  Constitutional Law, Probable cause.  Search
    and Seizure, Probable cause.  Probable Cause.  Cellular
    Telephone.



    Indictments found and returned in the Superior Court
Department on June 29, July 13, and July 18 2017.

    The cases were tried before Janet L. Sanders, J.


    Megan A. Siddall for the defendant.
    Nicole M. Nixon, Assistant Attorney General, for the
Commonwealth.


    GREEN, C.J.  Following a jury trial in the Superior Court,

the defendant and a codefendant, Pingxia Fan,[1] were convicted on

_____

    [1] Both defendants appealed from their convictions.  The
Supreme Judicial Court transferred Fan's appeal to that court on

various charges arising from their operation of a series of brothels in North Reading, Quincy, Boston, and Cambridge.[2] On appeal, the defendant contends that the evidence was insufficient to support his convictions, and that the information provided in support of a search warrant application was inadequate to establish a nexus between the alleged crimes and his home and cell phone.[3] Discerning no cause in the defendant's various claims to disturb the judgments, we affirm.

---

its own motion, and the defendant's appeal in the present case was stayed pending that review. In Fan's appeal, the Supreme Judicial Court affirmed her convictions, disposing of several claims raised by the defendant in this appeal: (1) that the Commonwealth was required to prove the identity of a specific victim; and (2) that the trial judge erroneously (a) excluded grand jury testimony of two witnesses who were unavailable at trial, and (b) admitted evidence describing a distraught unidentified woman (inferably a human trafficking victim) outside the North Reading location. See Commonwealth v. Pingxia Fan, 490 Mass. 433 (2022). We accordingly do not consider those claims in the present appeal. A third codefendant, Simon Lin, was also tried and acquitted of a single count of human trafficking in the same trial.

[2] The charges included multiple counts of trafficking of persons for sexual servitude, see G. L. c. 265, § 50 (a); deriving support from prostitution, see G. L. c. 272, § 7; keeping a house of ill fame, see G. L. c. 272, § 24; and money laundering, see G. L. c. 267A, § 2.

[3] Though the defendant mentions the search of his vehicle in the caption in his brief to the section discussing the search warrant, his brief does not otherwise offer any argument challenging the searches of either his vehicle or his bank records. We "need not pass upon [these] questions or issues" as they are "not argued in the brief." See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).

Background.  We summarize the facts the jury could have found, viewing the evidence in the light most favorable to the Commonwealth.  See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).  In January 2017, law enforcement began to investigate five different residences[4] located in North Reading, Boston, Quincy, and Cambridge where they believed illegal sexual services were being provided.  Police found the apartments through advertisements for massage services on the website Backpage.com (Backpage),[5] and then contacted the leasing offices for those apartments.  The defendant's name was on the rental agreements for the North Reading and Cambridge apartments and one of the Quincy apartments, and the defendant signed as a witness to Fan's signature on the rental agreement at the other

---

[4] Four of the five locations were apartments; the location in North Quincy was a single-family house.  For convenient reference, we refer hereafter to the locations collectively as "apartments."

[5] "'Backpage.com (Backpage) [was] a website that allow[ed] individuals to advertise a variety of products and services through user-generated posts.'  Commonwealth v. Lowery, 487 Mass. 851, 853 n.1 (2021).  Although Backpage was used to advertise many legal goods and services, it became well known for hosting "80 percent of the online advertising for illegal commercial sex in the United States."  See Citron & Wittes, The Problem Isn't Just Backpage:  Revising Section 230 Immunity, 2 Geo. L. Tech. Rev. 453, 453 (2018).  See also Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 16 (1st Cir. 2016), cert. denied, 137 S. Ct. 622 (2017); Backpage.com, LLC v. Dart, 807 F.3d 229, 230 (7th Cir. 2015), cert. denied, 137 S. Ct. 46 (2016)."  Pingxia Fan, 490 Mass. at 436 n.2.

Quincy apartment.[6]  The defendant also paid monthly rent for each of those apartments, using checks that included his name and home address.[7]

On January 2, 2017, police stopped the defendant after observing him make an illegal U-turn outside the North Reading apartment.  The defendant told the officers that he was coming from his home in Gloucester to his secondary residence at the North Reading apartment to check the mail and empty the trash in the Dumpster by the apartment building.  In the Dumpster where the defendant said he had left trash from the apartment, officers found one black trash bag on top of a pile of cardboard boxes.  The officers opened the trash bag and found used condoms, condom packaging with the brand name "Kimono," and small cards explaining "How to use a condom" in multiple languages.

For the next three months, police surveilled each apartment location.  They observed the defendant at the locations in North Reading, Boston, North Quincy, and Cambridge regularly taking out the trash from the apartments and bringing groceries and

_____

[6] The fifth apartment, located in Boston, was Fan's residence in addition to serving as one of the brothel locations.

[7] Fan initially paid the rent for one of the Quincy apartments, but after the first few months, the defendant paid the rent and utility payments for that apartment.

other supplies into each.  Police frequently observed the defendant visit each location, where upon arrival he brought bags of supplies inside, stayed for a brief time, and then left with bags of trash.  Police also frequently observed men visit the apartments, enter when young Asian women answered the door, and leave within an hour thereafter.  Police interviewed several of the men after they left the apartments.  The men admitted that they had gone to the apartments in response to an advertisement for massage services on Backpage, that they had given money to the women in the apartments, and that after a brief massage they received sexual services.  The men also explained that, though the advertisements were for massage services, they understood and expected that they would receive sexual services.

Officers obtained and simultaneously executed a warrant to search the five locations, the defendant's home in Gloucester, the defendant's vehicle, various bank accounts and safe deposit boxes belonging to the defendant and Fan,[8] and the defendant's cell phone.  In each of the apartment locations, officers found similar scenes:  sparse furnishings, mattresses on the floor,

---

[8] In addition to the records subpoenaed during the investigation and relied on in the search warrant affidavit, the search subsequent to the warrant revealed a safe deposit box bearing the defendant's name and home address and containing $10,000 in cash.

supplies of Kimono-brand condoms and paper towels, and cash. At several of the apartments, officers found papers, including utility bills with the defendant's name, ledgers with the names "Kiki" and "AA" and a list of numbers that corresponded to the prices the massage customers testified to having paid, and, at the Boston location, a bank statement bearing the defendant's name and a printout of a Backpage advertisement.

In the defendant's Gloucester home, officers found cash, ledgers with the names "Kiki," "Angel," and "EE" alongside columns of numbers, and a cardboard box full of condoms. A safe in the defendant's bedroom contained bank statements with the defendant's name that listed checks paid for the North Reading and Quincy apartments, utility bills with the defendant's name, and documents (including bank statements and utility bills) and a driver's license with Fan's name. The defendant was arrested and his cell phone seized from his person. A digital evidence analyst extracted data from the defendant's cell phone, including numerous text messages and telephone calls between the defendant and an "Amy E";[9] e-mail messages regarding the rental of the apartments in North Reading and Quincy; a saved password for a Backpage account; and an Internet history including searches for apartment rental websites and Backpage. The cell

---

[9] There was evidence that Fan was sometimes called "Amy."

phone also contained a video of two women in bathrobes speaking to each other in Chinese that was recorded near one of the Quincy apartments, and a video of an Asian woman in lingerie that was recorded near the Boston apartment.

Additionally, a search of the defendant's financial records obtained by subpoena revealed purchases of mattresses, a charge from Backpage, utility payments for the North Reading apartment, and twenty-seven cash deposits totaling $48,110 from 2016 to 2017 with no indication of payments to the defendant from an employer or payroll account.

Discussion. 1. Sufficiency of the evidence. The defendant challenges the sufficiency of the evidence in two respects.[10] First, he contends that the evidence did not establish that he knew of the criminal enterprise. He also contends that the evidence did not establish that he derived

---

[10] Each of the charged offenses includes an element of knowledge. General Laws c. 265, § 50 (a), states that "[w]hoever knowingly . . . subjects . . . , recruits, entices, harbors, transports, provides or obtains by any means . . . another person to engage in commercial sexual activity . . . shall be guilty of the crime of trafficking of persons for sexual servitude." General Laws c. 272, § 24, prohibits "keep[ing] a house of ill fame which is resorted to for prostitution." General Laws c. 272, § 7, prohibits anyone, "knowing a person to be a prostitute, [from] liv[ing] or deriv[ing] support . . . from the earnings or proceeds of his prostitution." General Laws c. 267A, § 2, prohibits "transport[ing] or possess[ing] a monetary instrument or other property that was derived from criminal activity with the intent to promote, carry on or facilitate criminal activity."

support from it.  In evaluating a challenge to the sufficiency of the evidence, we consider whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (citation omitted).  Latimore, 378 Mass. at 677.  A fact finder may make reasonable inferences from the evidence, but a conviction "may not rest on the piling of inference upon inference or on conjecture and speculation" (citation omitted).  Commonwealth v. Colas, 486 Mass. 831, 836 (2021).

The Commonwealth presented evidence supporting a conclusion that the defendant had worked together with Fan in a human trafficking scheme since 2016, when a Backpage advertisement invited women interested in working as "female companions" to call the defendant's cell phone number.[11]  The defendant also made at least one payment to Backpage, and saved a Backpage account password on his cell phone.  The defendant's repeated engagement with Backpage casts substantial doubt on his claim that he was unaware of the advertisements posted there.  There was also evidence that those advertisements included photographs of scantily clad or topless young Asian women, and offered "NURU

---

[11] The advertisement also included an e-mail address that was registered to Fan.

[m]assage," "SHOWER TOGETHER," "KISSING [g]irlfriend package," "[s]exy [l]ingerie," and "[e]verything . . . naked."  A rational person viewing the advertisements would infer that services other than ordinary massage were being offered.  Indeed, the customers who spoke to the police after leaving the apartments testified at trial that, though the advertisements did not explicitly promise sexual activity, they expected to receive sexual services during their visits.

Surveillance showed that the defendant frequently visited the apartments that he rented, both alone and accompanied by Fan, to bring in supplies and take out trash.  When the defendant told the police he had dropped trash in a Dumpster, the police opened the only trash bag in that Dumpster and found Kimono-brand condoms and packaging and other evidence of sexual trafficking.  Kimono-brand condoms were also found inside the apartments and a cardboard box full of condoms was found at the defendant's home in Gloucester.  Each apartment was sparsely furnished, except for mattresses on the floor, and held few indicia of residential life; the supplies stocked in each consisted mainly of condoms and similar items indicating sexual activity, and cash.  The defendant would have seen these items and observed the condition of each apartment, which are far more consistent with sexual activity than with ordinary apartment living or massage services, every time he visited them.

The inference that the defendant knew of the sexual services operation is bolstered by the evidence found at his Gloucester home and on his cell phone. The defendant kept customer ledgers similar to those found in the apartments, condoms, and quantities of cash at his home. His cell phone contained videos of scantily clad Asian women at multiple locations coinciding with the apartment locations. Finally, the large amounts of cash deposited into the defendant's bank account beginning in 2016, with no indication of employment or any other source of income, supported the inference that the defendant was profiting from the sexual services operation.

Neither mere presence at the scene of a crime nor association with a person involved in the crime is sufficient to convict a defendant under a joint venture theory. See Commonwealth v. Silvia, 97 Mass. App. Ct. 151, 155 (2020); Commonwealth v. Meehan, 33 Mass. App. Ct. 262, 265 (1992). The evidence in the present case, however, rebuts the defendant's claim that he was unaware of commercial sexual activity within the apartments or that he was not involved in its support. The defendant's activities, both on Backpage and at the apartments, along with the evidence found in the defendant's possession at his home and on his cell phone, were more than sufficient for a reasonable jury to infer that the defendant was both aware of and actively engaged in the illegal sexual services operation in

concert with Fan. See Commonwealth v. Merry, 453 Mass. 653, 661 (2009) (inferences need only be reasonable, not necessary or inescapable). See also Commonwealth v. Mullane, 445 Mass. 702, 715-716 (2006).

2. Searches of the defendant's house and cell phone. The defendant separately claims that the search of his home was not supported by probable cause, and therefore violated the Fourth and Fourteenth Amendments to the United States Constitution, art. 14 of the Massachusetts Declaration of Rights, and G. L. c. 276, § 1. When reviewing the sufficiency of a warrant application, our "inquiry begins and ends with the 'four corners of the affidavit' that supported it" (citation omitted). Commonwealth v. Escalera, 462 Mass. 636, 638 (2012). We consider the affidavit as a whole and in a commonsense manner, and give "considerable deference to the magistrate's determination [of probable cause]" (citation omitted). Commonwealth v. Andre-Fields, 98 Mass. App. Ct. 475, 486 (2020). See Commonwealth v. McDermott, 448 Mass. 750, 767, cert. denied, 552 U.S. 910 (2007). A search warrant is supported by probable cause when the facts in the accompanying affidavit provide a "substantial basis to conclude that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues" (quotations and

citations omitted).  Commonwealth v. Snow, 486 Mass. 582, 586 (2021).  A nexus between the items sought and the place to be searched need not be based on direct observations, but may be based on "the type of crime, the nature of the . . . items [sought], the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to [keep the items sought]" (citation omitted).  Commonwealth v. Fernandes, 485 Mass. 172, 184 (2020), cert. denied, 141 S. Ct. 1111 (2021).  An affidavit need not show that "evidence more likely than not will be found"; it must provide "merely that quantum of evidence from which the magistrate can conclude, applying common experience and reasonable inferences, that items relevant to apprehension or conviction are reasonably likely to be found at the location."  Commonwealth v. Murphy, 95 Mass. App. Ct. 504, 509 (2019).  The fact that the place to be searched is the defendant's home is not sufficient by itself to establish that evidence of a crime will be found there; the affidavit must contain "particularized information based on police surveillance or otherwise, that would permit a reasonable inference that the defendant likely kept [evidence of a crime] in the home" (quotation and citation omitted).  Escalera, supra at 643.

Based on the defendant's extensive role in, and sprawling nature of, the operation, involving multiple participants, five

locations across four cities, multiple vehicles used to transport multiple victims, and multiple banks accounts, the judge who issued the warrant to search the defendant's home was justified in doing so. See Andre-Fields, 98 Mass. App. Ct. at 484 ("the type of crime involved, and the apparent scope of the operation, permitted the inference that [the defendant] would maintain records of his . . . business" at his apartment).

In Andre-Fields, we held that there was probable cause to search the defendant's residence where the search warrant affidavit allowed the inference that the defendant regularly stayed at his apartment and used it as a home base for his ongoing illegal operation. See Andre-Fields, 98 Mass. App. Ct. at 482-483.

In the present case, it was similarly reasonable to expect that evidence of the crimes would be found in the defendant's home. Police surveilled the defendant, Fan, and each of the apartments used as brothels for months. As described in the preceding section, based on the defendant's role in leasing and paying rent and utilities for the apartments, his frequent and large bank deposits totaling nearly $50,000 in cash (with no other identifiable source of income), and his repeated visits to each location, bringing supplies and removing trash, it was reasonable for the warrant judge to conclude that the defendant played a central role in the human trafficking scheme. Police

located the defendant's home from surveillance of the defendant's vehicle, as well as the information used by the defendant for the bank accounts into which he deposited cash proceeds inferably from the business, and from which he paid rent and utilities for the apartments used in the business.

In the affidavit supporting the application for a search warrant, the affiant relied on his training and experience to state that persons running illegal businesses often store business records (including papers, documents, and various computer-generated records) and large amounts of cash in their homes or vehicles, and on their cell phones and computers.[12]

Taking as a whole the information in the affidavit, it was reasonable to expect that cash proceeds of the business, bank and other financial records inferably related to the business, and leases and utility bills related to the five apartments housing the business's operations would probably be found at the defendant's house, rather than within any one or more of the individual apartments, particularly since the apartments were spread across a large area, contained very few furnishings other than mattresses and items used for sexual activity, and saw a steady stream of patrons going in and out of the apartments

---

[12] Of course such statements, standing alone, would not establish probable cause, but here, as discussed infra, there was more.

after brief encounters.  Instead, the need to coordinate the operation of multiple locations, employ women to work at each location, and supply each location with items to facilitate commercial sex supported the inference that the defendant's human trafficking operation would be coordinated from a single location, separated from customer traffic, and would generate business records held at that location, particularly in light of the fact that it was listed as the address for the bank account into which deposits of cash proceeds were made and from which rent and utility bills were paid.  See Murphy, 95 Mass. App. Ct. at 513 (procurement of equipment, mapping of targets, and employment of accomplices gave rise to inference that incriminating records were generated and located at place where such activities occurred).[13]

Similarly, the warrant application furnished probable cause to search the defendant's cell phone.  The affiant stated that,

_____

[13] Though we conclude that the affidavit furnished probable cause to support a search of the defendant's Gloucester home, we are unpersuaded by the Commonwealth's suggestion that the probability calculus is enhanced by an incident in which police observed the defendant removing a trash bag from the North Reading apartment, putting it in his car, and driving away; police then observed the defendant's car at his home, twenty-five miles away, approximately two hours later.  Accepting the inference that the defendant transported the trash bag from the North Reading apartment to his home, we see no particular likelihood that the defendant would have brought the bag inside his home upon arriving there, or that police could expect to find it or others like it upon execution of the search warrant.

based on his training and experience, persons involved in running human trafficking operations utilize computers, online services, and cell phones to advertise or recruit commercial sex business. Indeed, the investigation revealed that the operation relied on Backpage advertisements, suggesting that evidence of activity related to placement of those advertisements could be expected to be found on the defendant's cell phone. Compare Commonwealth v. Lowery, 487 Mass. 851, 857 (2021) (probable cause to search cell phone associated with telephone number listed in Backpage advertisement for sexual services), with Commonwealth v. White, 475 Mass. 583, 590 (2016) (no probable cause where affidavit failed to establish existence of particularized evidence). Additionally, police were aware that the defendant was in regular communication with Fan, whom they suspected to be working in concert with the defendant to run the business. These facts together rise above a reliance on the "general ubiquitous presence of cellular telephones in daily life." Lowery, supra at 858, quoting Commonwealth v. Morin, 478 Mass. 415, 426 (2017). The defendant's communications with Fan, in conjunction with the central role that cell phones play in commercial sex operations and the pair's reliance on Backpage advertisements to conduct their business, provided probable cause to search the defendant's cell phone.

3. Evidentiary matters. The defendant claims that the

trial judge erred in admitting prior bad act evidence and physical evidence that police found in a Dumpster outside the North Reading apartment. The defendant preserved his objections when he moved to exclude the evidence, so we review for prejudicial error. See Commonwealth v. Grady, 474 Mass. 715, 719 (2016). We consider each contention in turn.

a. Prior bad act evidence. The defendant argues that the trial judge erred in allowing a 2016 Backpage advertisement recruiting "female companions" and including the defendant's cell phone number. Prior bad acts are inadmissible to show a defendant's bad character or propensity to commit a crime. See Commonwealth v. Almeida, 479 Mass. 562, 568 (2018); Mullane, 445 Mass. at 708-709. Such evidence may, however, be admissible to "establish motive, opportunity, intent, preparation, plan, knowledge, identity, or pattern of operation" (citation omitted). Almeida, supra. See Mass. G. Evid. § 404(b)(2) (2022). In the context of the other evidence illustrating the nature of the business operated by the defendant and Fan, the Backpage advertisement (posted six months before the charged conduct) was relevant to show that the defendant was part of an ongoing and extensive scheme with Fan to hire women to work for them in multiple locations around Boston. Indeed, several of the victims described moving to the Boston area to work in response to such advertisements, and meeting Fan by arrangement

through such an advertisement before beginning to work for her. When considered together with the rest of the copious evidence tying the defendant to the human trafficking scheme, the evidence was relevant and not unduly prejudicial.

b. Evidence from a Dumpster outside the North Reading apartment. The defendant also challenges the admission of evidence that the police found in a Dumpster outside the North Reading apartment that included used condoms, condom packaging, and other evidence of commercial sexual activity. The police searched the Dumpster shortly after the defendant told them he had just emptied trash from his apartment there, and found a single trash bag sitting on top of a large pile of cardboard boxes. It is a reasonable inference that the single trash bag on the top of the pile of cardboard in the Dumpster was the one left there only minutes earlier by the defendant. It was therefore not an abuse of discretion to admit the evidence. See Commonwealth v. Miller, 475 Mass. 212, 228 (2016) (weaknesses in chain of custody go to weight, not admissibility, of evidence).

Judgments affirmed.